2013 UT 75

**Alexander KERR, Appellee,**

v.

**CITY OF SALT LAKE, Appellant.**

**No. 20110909.**

Supreme Court of Utah.

Dec. 17, 2013.

Stephen K. Christiansen, Brady Brammer, Salt Lake City, for appellee.

J. Wesley Robinson, Margaret D. Plane, Salt Lake City, for appellant.

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 Alexander Kerr injured himself when he tripped on a sidewalk defect in Salt Lake City. He sued the city and obtained a judgment in his favor. Salt Lake City now appeals, alleging: (1) the city is entitled to discretionary function immunity, (2) Mr. Kerr did not present evidence that the city had adequate notice of the sidewalk defect during summary judgment proceedings or at trial, and (3) the trial court erroneously excluded opinion testimony regarding the level of danger posed by the sidewalk defect. We find no reversible error and affirm the judgment.

## BACKGROUND

¶ 2 Mr. Kerr tripped on an uneven section of sidewalk maintained by Salt Lake City and fell to the ground, shattering his kneecap. The condition that caused Mr. Kerr to fall was a raised segment of sidewalk that created a ledge across the width of the sidewalk that ranged from three-quarters of an inch to one inch in height.

¶ 3 The accident occurred next to the Metropolitan Inn. Sok Joo Hwang purchased the Metropolitan Inn one and a half years before the accident. At the time of the acquisition, Mr. Hwang noticed the sidewalk displacement already existed in approximately the same condition as on the date of the accident. Because laundry carts pushed by Metropolitan Inn employees were getting caught on the raised section of sidewalk, Mr. Hwang instructed his front desk employee to call Salt Lake City officials to request that the city repair the sidewalk.

¶ 4 Salt Lake City received the employee's call informing it of the sidewalk displacement eight days before Mr. Kerr's accident. Under Salt Lake City's policies, when the city learns of a sidewalk defect it dispatches a city employee to evaluate the condition. If the employee determines the defect consists of a displacement less than one and a half inches, the city may use a horizontal saw to cut away the protruding section of concrete to allow for a smoother transition from one section of concrete to the next. Salt Lake City performs this service at no cost to the adjacent landowner. Alternatively, the city may inform an adjacent business of the replacement cost of a defective section of sidewalk, and replace the sidewalk if the business elects to pay for it. Finally, if a city employee determines that a sidewalk defect is dangerous to the public, the city will barricade and replace the sidewalk.

¶ 5 On an undetermined date within seven days of receiving notice of the sidewalk defect, a city employee inspected the sidewalk. Seven days after the Metropolitan Inn employee called Salt Lake City, the city generated an estimate of the cost to replace the defective section of sidewalk. The estimate informed the Metropolitan Inn that the city would perform this service if the business paid $546 to the city—the full cost of the sidewalk replacement. The day after Salt Lake City created the estimate, Mr. Kerr tripped on the sidewalk displacement and injured himself.

¶ 6 Mr. Kerr sued Salt Lake City, alleging the city negligently failed to maintain the sidewalk. Salt Lake City moved for summary judgment at the close of discovery, arguing that it was entitled to discretionary function immunity and that Mr. Kerr's claim failed as a matter of law because he had not produced evidence that the city had adequate notice of the sidewalk defect to repair it. The trial court denied the motion for summary judgment and the case was set for trial.

¶ 7 Before trial, the court granted Salt Lake City's motion in limine to prohibit Mr. Kerr's expert witness from giving his opinion that the sidewalk displacement was hazardous. After the plaintiff's case in chief, Salt Lake City moved for a directed verdict, renewing its argument that Mr. Kerr had not produced evidence that the city had adequate notice to remedy the sidewalk defect. The trial court found that, as a matter of law, Salt Lake City did not have an adequate amount of time after receiving notice of the defect to repair the sidewalk, granted the motion for a directed verdict, and dismissed the jury.

¶ 8 Mr. Kerr moved for a new trial based on legal error, arguing the trial court improperly directed a verdict in favor of Salt

Lake City. The court granted a new trial, ruling that it had erred by granting a directed verdict because whether the city had sufficient notice to remedy the sidewalk displacement was a jury question.

¶ 9 Before the retrial, the trial court affirmed its prior ruling prohibiting Mr. Kerr's expert witness from testifying that the sidewalk was hazardous. Based on this ruling, Mr. Kerr moved to prohibit both Mr. Hwang and Lynn Jarman, Salt Lake City's Capital Project Planning Manager, from giving their opinions on whether the displacement was hazardous. The trial court granted Mr. Kerr's motion in limine. At the close of Mr. Kerr's case in chief, Salt Lake City again moved for a directed verdict on the same grounds asserted in the first trial. The trial court denied the motion.

¶ 10 After the trial, a jury returned a verdict for Mr. Kerr. Salt Lake City appealed from the resulting judgment.

## ANALYSIS

### I. DISCRETIONARY FUNCTION IMMUNITY

¶ 11 Salt Lake City first argues that the trial court erred when it denied the city's motion for summary judgment because the city is entitled to discretionary function immunity. We review for correctness a trial court's denial of summary judgment when the court bases its ruling on a purely legal determination. *Normandeau v. Hanson Equip., Inc.,* 2009 UT 44, ¶ 15, 215 P.3d 152. De novo review is appropriate here because "a party's entitlement to discretionary function immunity is a question of law," provided that the trial court has sufficient facts before it to evaluate the question of immunity. *Laney v. Fairview City,* 2002 UT 79, ¶ 16, 57 P.3d 1007.[1] The facts before the trial court were sufficient to allow it to rule on the immunity question. *See infra,* ¶ 25.

#### A. Structure of the Utah Governmental Immunity Act

¶ 12 The Utah Governmental Immunity Act requires a three-step analysis to determine if a governmental entity is immune from liability. *Van de Grift v. State,* 2013 UT 11, ¶ 8, 299 P.3d 1043. We first consider whether the Act affords immunity to the governmental conduct. *See* Utah Code § 63G–7–201(1). If the Act does afford immunity, we next examine whether the Act waives immunity in the particular circumstance at issue. *See id.* § 63G–7–301(1)–(4). Finally, if a waiver does apply, we determine whether the governmental action qualifies as an exception to the waiver of immunity. *See id.* § 63G–7–301(5).

¶ 13 The parties agree that Salt Lake City is immune for "any injury that results from the exercise of a governmental function." *Id.* § 63G–7–201(1). They also agree that immunity is waived in circumstances where there is a "defective, unsafe, or dangerous condition of any ... sidewalk." *Id.* § 63G–7–301(3)(a)(i). The parties disagree, however, over whether Salt Lake City's decision not to remedy the sidewalk displacement that caused Mr. Kerr's injuries qualifies as a discretionary function, which would restore Salt Lake City's immunity. *See id.* § 63G–7–301(5)(a).

¶ 14 The discretionary function exception allows the government to retain immunity for high-level policy decisions "regulated by the political process." *Johnson v. Utah Dep't of Transp.,* 2006 UT 15, ¶ 20, 133 P.3d 402 (internal quotation marks omitted). Otherwise the threat of lawsuits "would make public administration all but impossible." *Id.* (internal quotation marks omitted). This exception, however, must be read narrowly in order to prevent it from swallowing a general waiver of governmental immunity. *Id.* ¶ 19.

¶ 15 Salt Lake City argues that because it maintains approximately eight hundred miles of sidewalk with a limited budget, its decision not to remedy the defective section of sidewalk that caused Mr. Kerr to trip and fall should be deemed a discretionary function. But since any repair decision necessarily involves the allocation of limited

---

1. *Laney v. Fairview City* is a plurality opinion. 2002 UT 79, ¶¶ 73–74, 84–85, 140, 57 P.3d 1007. But because four justices agreed with almost all of the main opinion's discretionary function analysis, that portion of the opinion is binding precedent. *Id.*

funds, the inevitable extension of the city's argument is that all maintenance decisions are discretionary functions. Thus, the broad interpretation of the discretionary function exception advocated by Salt Lake City would completely negate the explicit waiver of liability for the "dangerous condition of any . . . sidewalk." UTAH CODE § 63G–7–301(3)(a)(i).

¶ 16 When interpreting statutes, "we must give effect to every provision of a statute and avoid an interpretation that will render portions of a statute inoperative." *Thayer v. Washington Cnty. Sch. Dist.*, 2012 UT 31, ¶ 12, 285 P.3d 1142 (internal quotation marks omitted). If we restore immunity to Salt Lake City through the discretionary function exception, we would render the specific waiver of immunity for the "defective, unsafe, or dangerous condition of any . . . sidewalk" inoperative. UTAH CODE § 63G–7–301(3)(a)(i). Because all cities must decide how to allocate scarce public funds to maintain sidewalks, Salt Lake City's interpretation of the discretionary function exception would completely negate the explicit waiver of governmental immunity for defective or dangerous sidewalks. For this reason alone, we must reject Salt Lake City's broad governmental immunity claim. *See Johnson*, 2006 UT 15, ¶ 36, 133 P.3d 402, (holding that discretionary function immunity may not be interpreted to create "blanket immunity for governmental negligence in every case where the government saves money").

### B. The Discretionary Function Exception

¶ 17 An independent analysis of the discretionary function exception also demonstrates that Salt Lake City did not carry its burden to show that it qualifies for discretionary function immunity. *See id.* ¶ 21 ("[T]he government carries the burden to prove that it qualifies for the discretionary function exception to the immunity waiver."). When determining if the discretionary function exception applies to a particular case, courts look to the test established in *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983). The *Little* test asks four questions:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* at 51.

¶ 18 Utah adopted the *Little* test from a Washington case, *Evangelical United Brethren Church of Adna v. State*, 67 Wash.2d 246, 407 P.2d 440, 445 (1965). *Little*, 667 P.2d at 51. The Washington Supreme Court explained that when all of the questions are clearly answered in the affirmative, "then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process." *United Brethren*, 407 P.2d at 445. But if "one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved." *Id.* Utah courts have applied this test consistent with these guidelines and have found discretionary function immunity only where all of the questions are answered affirmatively. *Compare Johnson*, 2006 UT 15, ¶ 39, 133 P.3d 402 (rejecting discretionary function immunity because the second and third questions were answered in the negative), *with Laney*, 2002 UT 79, ¶ 21, 57 P.3d 1007 (upholding discretionary function immunity because all four questions were answered affirmatively), *and Keegan v. State*, 896 P.2d 618, 624 (Utah 1995) (same); *see also Laney*, 2002 UT 79, ¶ 15, 57 P.3d 1007 ("An affirmative response to *each* [*Little*] inquiry leads to the conclusion that the action

under review is a discretionary function." (emphasis added)).

¶ 19 Applying the *Little* test, we answer the first and fourth questions affirmatively. The parties do not dispute that the first factor is met because Salt Lake City's program of building and maintaining sidewalks involves "a basic governmental policy, program, or objective" of providing public walkways. *See Johnson*, 2006 UT 15, ¶¶ 23–24, 133 P.3d 402. The fourth factor is also satisfied because Salt Lake City had the requisite authority to make decisions regarding sidewalk repair.[2] An affirmative response to the first and fourth questions of the *Little* test, however, is not dispositive. *See id.* ¶¶ 25, 38–39. The fact that a governmental act, omission, or decision involves a basic governmental policy and is within a governmental entity's authority does not, by itself, mean that the government is immune from suit.

¶ 20 The second question—whether an act, omission, or decision is essential to the accomplishment of the governmental policy—is answered in the negative here. Salt Lake City did not produce evidence that its decision not to remedy the displaced sidewalk that Mr. Kerr tripped on was *essential* to its program of building and maintaining sidewalks throughout the city. An individual decision regarding one piece of sidewalk does not destroy Salt Lake City's ability to continue a broader sidewalk policy and program.

¶ 21 The third question—whether the act, omission, or decision requires the exercise of a basic policy evaluation—is often the most determinative because it epitomizes the primary purpose of the *Little* test: to distinguish between broad policy decisions and operational decisions that implement a given governmental policy. *Keegan*, 896 P.2d at 625 n. 4 (discretionary function immunity is not available for "practical operational choices of how specifically to carry out some previously made policy-based decision"); *Doe v. Arguelles*, 716 P.2d 279, 283 (Utah 1985) ("A decision or action implementing a preexisting policy is operational in nature and is

undeserving of protection under the discretionary function exception."); *Andrus v. State*, 541 P.2d 1117, 1120 (Utah 1975) ("The decision to build the highway and specifying its general location were discretionary functions, but the preparing of plans and specifications and the supervision of the manner in which the work was carried out cannot be labeled discretionary functions."); *Carroll v. State*, 27 Utah 2d 384, 496 P.2d 888, 891 (1972) ("[A]lthough basic policy decisions are allowed immunity, [the discretionary function] exception is not extended to the ministerial implementation of that basic policy."). The key to distinguishing policy decisions from operational decisions is evaluating whether "the government actually exercises a level of discretion in a manner that implicates policy-making and thrusts the decision into the political process." *Johnson*, 2006 UT 15, ¶ 21, 133 P.3d 402; *accord Keegan*, 896 P.2d at 623 ("Where the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government, the courts have refrained from sitting in judgment of the propriety of those decisions." (internal quotation marks omitted)).

¶ 22 Our case law has identified several examples of operational decisions that involve "everyday, routine matters not requiring evaluation of broad policy factors." *Johnson*, 2006 UT 15, ¶ 31, 133 P.3d 402 (internal quotation marks omitted). For example, the Utah Department of Transportation's (UDOT) decision to use orange plastic barrels to separate traffic from a construction zone rather than a concrete barrier was operational. *Id.* ¶¶ 30–37. This decision was merely a small part of the implementation of the larger policy decision to repair a section of highway, and it was not made at the highest echelon of UDOT's hierarchy. *Id.* ¶ 35. In another case, we determined that a city's failure to repair a known breach in a fence separating a playground from a river was operational in nature and was not entitled to governmental immunity. *Stuckman ex rel. Nelson v. Salt Lake City*, 919 P.2d

---

2. Mr. Kerr argues that Salt Lake City had no authority to require a private landowner to repair an adjacent sidewalk. The city, however, did not require the Metropolitan Inn to repair

the sidewalk. Salt Lake City merely gave the Metropolitan Inn the option of paying for the sidewalk repairs and informed it of the cost.

568, 575–76 (Utah 1996); *see also Bigelow v. Ingersoll,* 618 P.2d 50, 53 (Utah 1980) (placement of an improperly synchronized traffic light was operational); *Andrus,* 541 P.2d at 1120 (implementation of a highway construction plan that resulted in inadequate drainage was operational); *Carroll,* 496 P.2d at 891 (decision of a road maintenance supervisor to use earthen berms to block access to a closed road was operational).

¶ 23 We have also identified examples of policy-making decisions that are immune from suit. For instance, a city's decision not to raise or insulate any of its power lines was made at the policy level. *Laney,* 2002 UT 79, ¶¶ 19, 22, 57 P.3d 1007. Similarly, UDOT's decision not to increase the height of a concrete median barrier separating lanes of traffic was a policy decision because a cost-benefit analysis was "carried out by senior engineers and circulated throughout and debated within the department." *Keegan,* 896 P.2d at 624; *but see Johnson,* 2006 UT 15, ¶¶ 32–35, 133 P.3d 402 (distinguishing *Keegan* from the facts of that case); *see also Duncan v. Union Pac. R.R.,* 842 P.2d 832, 835 (Utah 1992) (decisions concerning a plan for placement of railroad warning signs were policy determinations); *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.,* 784 P.2d 459, 463 (Utah 1989) (design of a flood control system was a policy decision).

¶ 24 In this case, Mr. Kerr alleged that Salt Lake City negligently failed to remedy a sidewalk displacement that caused him to trip and injure himself. If the city's failure to act was the direct result of policy-level decision making, it is immune from suit. If the omission resulted from an operational decision or from the ministerial implementation of a broader policy, Salt Lake City is subject to liability.

¶ 25 As noted above, Salt Lake City's official policies regarding sidewalk maintenance permit a range of responses to a sidewalk defect. A city ordinance provides that the replacement of a defective section of sidewalk may be accomplished by providing an estimate to an adjacent business owner and replacing the defective sidewalk if the business elects to pay the full cost of the replacement. SALT LAKE CITY, UTAH, CITY CODE § 14.32.320(C), *available at* http://www.sterlingcodifiers.com/codebook/index.php?book_id=672. The business's participation is voluntary. Providing an estimate to an adjacent business owner, however, is not Salt Lake City's only potential response to a defect. In a briefing paper submitted to the mayor and city council, Salt Lake City's Engineering Planning and Programming Manager summarized the city's policy of promoting sidewalk safety: "Salt Lake City has always exhibited a strong commitment to public safety. This commitment should be continued through the elimination of sidewalk tripping hazards and compliance with ADA standards." As part of this commitment to public safety, Salt Lake City adopted a written policy of eliminating tripping hazards through horizontal saw cutting: "Sidewalk sections with no defects other than a vertical displacement less than one and one-quarter inches are repaired through horizontal sawcutting. Sidewalk sawcutting [sic] is accomplished at no cost to the adjacent private property owner." The city's engineer in charge of sidewalks provided deposition testimony that the city performs horizontal saw cutting to "eliminate changes in grade that are less than approximately one-and-a-half inches." Finally, the engineer also testified in his deposition that if city employees become aware of an "extraordinary or hazardous condition," the city barricades the sidewalk and repairs the condition. But Salt Lake City provided no evidence of any policy-level guidelines for what constitutes a "hazardous condition." Thus, this decision is entrusted to the judgment of city employees.

¶ 26 In sum, Salt Lake City's sidewalk maintenance policies did not mandate the decision made by a city employee in this case to provide a sidewalk replacement estimate to the adjacent business but to take no other remedial measures. The city's policies also allowed—indeed promoted—horizontal saw cutting to eliminate tripping·hazards for displacements less than one and a quarter to one and a half inches. The displacement at issue here, which ranged "from one inch down to three-quarters of an inch," qualified for such a repair. Thus, the decision by a city employee not to directly remedy the

sidewalk defect is a classic operational determination—that is, a decision implementing the existing sidewalk maintenance policy. *See Stuckman*, 919 P.2d at 576 (a city's failure to repair a known breach in a fence was "an operational decision on the part of the governmental entity responsible for maintaining the fence"). In other words, this individual repair decision did not "implicate[ ] policy-making" or "thrust[ ] the decision into the political process." *Johnson*, 2006 UT 15, ¶ 21, 133 P.3d 402.

¶ 27 We therefore answer the second and third *Little* inquiries in the negative and hold that Salt Lake City is not entitled to discretionary function immunity. The trial court did not err by denying the city's summary judgment motion on this ground.

## II. EVIDENCE OF NOTICE OF THE SIDEWALK DEFECT IN THE SUMMARY JUDGMENT PROCEEDINGS

¶ 28 Salt Lake City also contends the trial court should have granted its motion for summary judgment because Mr. Kerr did not produce evidence that Salt Lake City had notice of the sidewalk displacement for a sufficient amount of time to remedy the defect. The city claims, in essence, that the trial court erred by finding the existence of a dispute of fact regarding an essential element of Mr. Kerr's claims.

¶ 29 We do not review on appeal, however, whether a dispute of material fact existed at the summary judgment stage of a litigation if the trial court denies summary judgment. *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 12, 309 P.3d 201 ("Appellate review is available only when a motion for summary judgment is denied on a purely legal basis."); *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 15, 215 P.3d 152 ("[W]hen disputed facts bear on the decision [to deny summary judgment] ... parties then have an obligation to reraise the issue at trial in order to preserve it for appeal.").

¶ 30 There are two reasons for this rule. First, the purpose of summary judgment "is to eliminate the time, trouble and expense of trial when upon any view taken of the facts as asserted by the party ruled against, he would not be entitled to prevail." *Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1101 (Utah 1995) (internal quotation marks omitted). Reviewing on appeal factual disputes related to the denial of summary judgment—long after a trial on the merits—obviously would not further the purpose of avoiding the trouble and expense of trial. *See Holley v. Northrop Worldwide Aircraft Servs., Inc.*, 835 F.2d 1375, 1377–78 (11th Cir.1988) ("[Summary judgment] was intended as a device to diminish the effort, time, and costs associated with unnecessary trials. In keeping with those purposes, we hold that the party whose motion for summary judgment was denied may not appeal the motion if the party admits that ... by trial the evidence had been supplemented or changed in some manner favorable to the party who opposed summary judgment."). Second, after the denial of a motion for summary judgment, both parties are afforded an opportunity to litigate factual disputes at trial. *See Wayment v. Howard*, 2006 UT 56, ¶ 20, 144 P.3d 1147 (refusing to review an order denying summary judgment because the denial did not prejudice the appellant, who "was accorded the opportunity to fully litigate his case" at trial). Thus, the proper focus of an evidentiary challenge on appeal shifts to the adequacy of the evidence presented at trial rather than at the summary judgment proceeding. It would serve no legitimate judicial purpose to reach back and overturn a verdict on the merits based on a litigant's failure to adduce evidence in opposition to summary judgment if the relevant evidence was presented at trial. In other words, the denial of summary judgment on evidentiary grounds should not "become a bomb planted within the litigation at its early stages and exploded on appeal." *Normandeau*, 2009 UT 44, ¶ 10, 215 P.3d 152 (internal quotation marks omitted).

¶ 31 We do not review, therefore, the trial court's denial of summary judgment based on its finding that a dispute of material fact existed as to whether Salt Lake City had sufficient notice of the sidewalk defect to remedy the condition.

## III. EVIDENCE OF NOTICE OF THE SIDEWALK DEFECT AT TRIAL

¶ 32 Salt Lake City also argues the trial court erred by granting Mr. Kerr's motion for a new trial after the first trial and by denying the city's motion for directed verdict at the second trial. In essence, the city asserts Mr. Kerr's negligence claim failed as a matter of law because he did not produce evidence at the first trial or the second trial that the city had sufficient notice of the sidewalk displacement to remedy the defect. Salt Lake City contends that a failure to produce this evidence at *either* the first trial or the second trial warrants a reversal of the judgment obtained after the second trial.

### A. Sufficiency of the Evidence at the First Trial

¶ 33 At the close of Mr. Kerr's case in chief in the first trial, the court ordered a directed verdict in favor of Salt Lake City, finding that Mr. Kerr had not produced evidence that the city had sufficient notice of the sidewalk displacement. The trial court then dismissed the jury. Mr. Kerr moved for a new trial, arguing the trial court had mistakenly granted the directed verdict. The trial court granted the motion for a new trial, and a second trial resulted in a verdict in favor of Mr. Kerr.

¶ 34 On appeal from the judgment entered after the second trial, Salt Lake City argues the trial court should not have granted the motion for a new trial because Mr. Kerr did not produce evidence of notice of the defect at the first trial. We first address the preliminary question of whether an appellate court may review an order granting a new trial where a jury did not enter a verdict in the first trial.

¶ 35 There is a split of authority on the question of whether an appellate court will review an order granting a new trial on appeal from a judgment rendered after a subsequent trial. 5 C.J.S. *Appeal and Error* § 859 (2007). Some states do not review the grant of a new trial. *See, e.g., Cummins v. Paisan Const. Co.,* 682 S.W.2d 235, 236 (Tex. 1984) ("An order granting a new trial ... is not subject to review either by direct appeal from that order, or from a final judgment rendered after further proceedings in the trial court." (internal quotation marks omitted)); *Quast v. Prudential Prop. & Cas. Co.,* 267 N.W.2d 493, 495 (Minn.1978) ("[U]pon an appeal from an order or judgment as a result of the last trial there can be no review of the evidence or proceedings at the former trial or of the order granting the new trial." (internal quotation marks omitted)). Appellate courts in other states, including Utah, generally review the grant of a new trial. *See Stubbs v. Third Judicial Dist. Court,* 106 Utah 539, 150 P.2d 783, 785 (1944).

¶ 36 Nearly a century ago, this court reasoned that the grant of a new trial after a verdict should be reviewable in order to preserve the integrity of jury verdicts:

> A contrary holding leads to this: No matter how often, or how whimsical or baseless the ground may be on which the trial court may set a verdict aside and grant a new trial, nevertheless, an aggrieved party will be compelled to accept what the court may choose to allow or impose upon him or abandon his cause or defense; for, no matter how often a case may be tried, the trial court, for mere capricious notions that the verdict is too large or too small may set it aside until a jury is found to respond to the court's notions of what the verdict and damages should be; and if, perchance, the proceedings on the last trial are without error, neither party can complain. Surely the statute does not contemplate no relief may be granted from such a prostitution of the constitutional trial by jury.

*Hirabelli v. Daniels,* 44 Utah 88, 138 P. 1172, 1173 (1914). An examination of subsequent cases reveals that this court has only reviewed the grant of a new trial in situations implicating the policy concerns expressed in *Hirabelli*—that is, where the grant of a new trial nullified a jury verdict. *Crellin v. Thomas,* 122 Utah 122, 247 P.2d 264, 264–65 (1952); *King v. Union Pac. R.R.,* 117 Utah 40, 212 P.2d 692, 699 (1949); *Bowers v. Gray,* 99 Utah 336, 106 P.2d 765, 765–66 (1940); *Klinge v. S. Pac. Co.,* 89 Utah 284, 57 P.2d 367, 369, 377 (1936).

¶ 37 This case is different, however, because the trial court granted a new trial in

a situation where the jury had not rendered a verdict. The justification for reviewing the grant of a new trial motion expressed in *Hirabelli*, therefore, is entirely absent. Because the jury did not enter a verdict, there is no danger that the trial court granted a new trial in order to negate a result it simply disagreed with in derogation of the litigants' rights to a trial by jury. *See Hirabelli*, 138 P. at 1173. Instead, the grant of a new trial in these circumstances is akin to a reconsideration of the trial court's prior directed verdict ruling, placing the litigants in the same procedural position as if the prior aborted trial had never occurred. *Haslam v. Paulsen*, 15 Utah 2d 185, 389 P.2d 736, 736 (1964) (granting a motion for a new trial "sets aside the verdict and places the parties in the same position as if there had been no previous trial"). In this situation, the same reasons for which we decline to review the denial of a motion for summary judgment on evidentiary grounds militate in favor of refusing to review the trial court's grant of a new trial motion. *See supra*, ¶¶ 29–30. Because the litigants had a full and fair opportunity to litigate the facts in the second trial, we need not evaluate the sufficiency of the evidence at the truncated first trial.

### B. Sufficiency of the Evidence at the Second Trial

¶ 38 Salt Lake City also contends the trial court erred by denying its motion for a directed verdict at the second trial because Mr. Kerr did not produce evidence that the city had sufficient notice of the sidewalk defect to remedy the condition. We uphold a trial court's denial of a directed verdict "if the evidence at trial raised a question of material fact which precluded judgment as a matter of law." *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933; *accord Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 ("A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor.").

¶ 39 A plaintiff seeking recovery for injuries caused by a temporary unsafe condition, such as the sidewalk defect at issue here, must show that the defendant had actual or constructive knowledge of the condition before the accident. *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 19, 104 P.3d 1185; *Schnuphase v. Storehouse Mkts.*, 918 P.2d 476, 478 (Utah 1996). Constructive knowledge may be proven by demonstrating that the unsafe condition "existed long enough that [the defendant] should have discovered it." *Jex v. JRA, Inc.*, 2008 UT 67, ¶ 18, 196 P.3d 576 (internal quotation marks omitted). In the case of either actual knowledge or constructive knowledge, the plaintiff must also show that the defendant had sufficient notice of the unsafe condition "that in the exercise of reasonable care [the defendant] should have remedied it." *Goebel*, 2004 UT 80, ¶ 19, 104 P.3d 1185 (internal quotation marks omitted). In other words, a plaintiff "must present evidence of the length of time that the defendant had notice" so that the fact-finder may evaluate whether the notice was sufficient to permit remedial measures. *Id.* ¶ 25.

¶ 40 In *Goebel*, for example, the plaintiff fell from his bicycle when his tire jammed into a gap as he was crossing a set of railroad tracks. *Id.* ¶¶ 4–6. The plaintiff theorized that the gap must have existed for a sufficient amount of time that the defendants had constructive notice of the dangerous condition of the railroad crossing. *Id.* ¶ 24. Absent any evidence of when the gap had formed or how long it had existed, however, the plaintiff could not prove the defendants had constructive knowledge "far enough in advance to repair the gap before [the] accident." *Id.* ¶ 25. In *Fishbaugh v. Utah Power & Light*, a pedestrian was injured when he was struck by a car during a period of time when a series of streetlights were out due to a malfunction. 969 P.2d 403, 404 (Utah 1998). The plaintiff presented evidence that the defendant had actual knowledge of the outage "at some time prior to the accident." *Id.* at 408. But without any evidence of precisely when the defendants had acquired this knowledge, the plaintiff could not "prove that the [defendants] failed to repair the streetlights within a reasonable time after receiving notice." *Id.*

¶ 41 Unlike the plaintiffs in *Goebel* and *Fishbaugh,* who presented no evidence of the amount of notice of the unsafe condition afforded to the defendants, Mr. Kerr proffered evidence supporting a conclusion that Salt Lake City had sufficient notice of the sidewalk defect to remedy its condition. First, Mr. Kerr produced evidence of sufficient constructive notice. Mr. Hwang testified that the sidewalk displacement existed in approximately the same condition a year and a half before Mr. Kerr's accident. A reasonable fact-finder could conclude from this evidence that Salt Lake City had constructive notice of the condition and should have discovered it in time to take remedial measures.

¶ 42 Mr. Kerr also presented evidence that Salt Lake City had sufficient actual notice of the defect to remedy the unsafe condition. Mr. Hwang testified that his employee called the city eight days before the accident to request that the sidewalk be repaired because laundry carts were catching on the displacement. Salt Lake City's call log records indicate that it received a call reporting the condition. And a Salt Lake City engineer admitted that the city became "aware of this change in elevation of the sidewalk" when it received the call from the Metropolitan Inn employee. Finally, Mr. Kerr presented evidence that a sidewalk displacement could be remedied either through horizontal saw cutting or through replacement of the defective section of sidewalk in less than a day. Spray painting the displacement to make it more visible could have been accomplished in seconds.

¶ 43 This evidence, taken in the light most favorable to Mr. Kerr, was sufficient to raise a question of material fact as to whether Salt Lake City had adequate notice of the sidewalk defect to take remedial measures. The trial court, therefore, properly denied the city's motion for a directed verdict.

## IV. EVIDENTIARY RULINGS

¶ 44 Salt Lake City argues the trial court erred by precluding the owner of the Metropolitan Inn, Mr. Hwang, and Salt Lake City's capital project manager, Mr. Jarman, from giving their lay opinion on whether the sidewalk displacement was dangerous. Be-

cause Salt Lake City invited the alleged error it now complains of, however, we will not review it. "The invited error doctrine prevents a party from taking advantage of an error committed at trial when that party led the trial court into committing the error." *Tschaggeny v. Milbank Ins. Co.,* 2007 UT 37, ¶ 12, 163 P.3d 615 (internal quotation marks omitted); *accord Wilson v. IHC Hosps., Inc.,* 2012 UT 43, ¶ 71, 289 P.3d 369. In other words, a litigant may not induce the trial court to make a ruling and then argue on appeal that the ruling was in error.

¶ 45 Salt Lake City first moved to exclude opinion testimony on whether the displacement was dangerous, requesting that the trial court bar Mr. Kerr's expert from giving his opinion that the defect posed a danger to pedestrians. The trial court accepted the city's argument that the degree of danger posed by the displacement was a jury question and prohibited Mr. Kerr's expert from giving his opinion on this subject. Mr. Kerr subsequently moved to exclude similar testimony from Mr. Hwang and Mr. Jarman, arguing that since the court had prohibited Mr. Kerr's expert from giving his opinion that the sidewalk was dangerous, the court must also prohibit lay witnesses from presenting opinions that the sidewalk was not dangerous: "[Mr. Jarman] can't come up here and tell this [j]ury that this was a hazardous condition or not a hazardous condition, or safe condition or not a safe condition anymore than our witness can. Or if he can, then our witness ought to be able to." Consistent with its prior ruling, the trial court barred Mr. Hwang and Mr. Jarman from giving testimony as to whether they believed the sidewalk displacement was safe or dangerous.

¶ 46 Having reaped the benefit of preventing Mr. Kerr's witness from presenting opinion testimony on the sidewalk displacement, Salt Lake City may not argue on appeal that the trial court erred by applying this ruling to other witnesses as well. *See State v. Tillman,* 750 P.2d 546, 560–61 (Utah 1987) (where defense counsel first raised the issue of the potential length of a criminal sentence in closing argument, the invited error doctrine prevented review of the prosecutor's

alleged misconduct in addressing the same issue in his closing argument); *In re Discipline of Corey*, 2012 UT 21, ¶ 19 n. 8, 274 P.3d 972 (where a party asked a witness to give expert testimony, the invited error doctrine prevented review of that party's contention on appeal that the trial court erred by allowing the witness to give expert testimony). The trial court's initial ruling excluding testimony regarding the dangerousness of the displacement, which was requested by Salt Lake City, necessarily required the court to exclude similar testimony from the city's witnesses. In these circumstances, the invited error doctrine prevents the city from retaining both the benefit of the ruling it asked for at trial and appellate review of subsequent rulings required by the city's requested ruling. *See Tschaggeny*, 2007 UT 37, ¶¶ 20, 23, 163 P.3d 615 (litigants may not retain both the strategic benefit afforded at trial by an invited error and the benefit of appellate review should the strategy fail).

¶ 47 Finally, Salt Lake City argues the trial court erred by excluding part of Mr. Jarman's testimony because his testimony "was important for establishing how the city responds to calls about sidewalks." In addition to barring Mr. Jarman from giving his opinion that the displacement was dangerous, the court ruled that Mr. Jarman "may not offer—and no questions should be asked that would elicit as to why he took or did not take any action." Viewed in isolation, this ruling appears problematic. A defendant's subjective reasons for acting or failing to act are relevant to the analysis of whether the defendant breached its duty of care. *See, e.g., Schnuphase v. Storehouse Mkts.*, 918 P.2d 476, 478 (Utah 1996) (noting evidence that a store was unaware of a slipping hazard posed by spilled ice cream because "the store employee behind the deli counter was busy with customers and did not see the potentially hazardous condition"); *Meese v. Brigham Young Univ.*, 639 P.2d 720, 723 (Utah 1981) ("Negligence is the failure to do what a reasonable and prudent person would have done *under the circumstances,* or doing what such person *under such circumstances* would not have done. The fault may be in acting or omitting to act. A corollary to that definition is that in the exercise of ordinary care, the amount of caution required will vary in accordance with the nature of the act and *the surrounding circumstances.*" (footnote omitted) (emphasis added)).

¶ 48 A fuller examination of the in limine hearing, however, reveals that the trial court did not exclude evidence of Salt Lake City's reasons for failing to remedy the sidewalk displacement. In response to Mr. Kerr's motion to exclude Mr. Jarman's opinions about the displacement, Salt Lake City argued that Mr. Jarman would not directly testify whether he believed the condition was dangerous. Instead, the city proposed to show Mr. Jarman pictures of the sidewalk displacement and ask him whether he would classify the displacement as a hazardous defect that would require immediate repair or as the type of normal defect that could be repaired by the adjacent landowner. Mr. Kerr opposed Salt Lake City's proposal, arguing that the city should not be permitted to perform an end run around the blanket exclusion of opinion testimony regarding the dangerousness of the displacement by having Mr. Jarman testify as to how the city would respond to the sidewalk defect (i.e., how the city would respond to a hazardous condition or a nonhazardous condition). In the context of these arguments, the trial court's ruling that Mr. Jarman could not testify "why he took or did not take any action" was merely a ruling that Mr. Jarman could not give indirect opinion testimony that the defect was not dangerous. In other words, Mr. Jarman could not testify that Salt Lake City would respond to this particular displacement in the same way it would respond to other nonhazardous conditions.

¶ 49 Mr. Jarman's testimony at trial further clarifies that the trial court's ruling only excluded opinion testimony regarding the characterization of the displacement at issue in this case. Mr. Jarman was permitted to testify extensively regarding his knowledge of Salt Lake City's policies regarding sidewalk repair, including how the city categorizes and responds to hazardous and nonhazardous sidewalk conditions; how the city repairs sidewalk defects through horizontal saw cutting, grinding, and sidewalk replacement; and budgeting con-

straints on the number of repairs the city can address. Counsel only objected when Mr. Jarman was asked for his opinion on whether a half-inch displacement was a tripping hazard and when Mr. Jarman spontaneously gave his opinion that he believed the sidewalks in Salt Lake City are reasonably safe. Taken in context, therefore, the trial court did not exclude testimony regarding Salt Lake City's reasons for failing to remedy the sidewalk displacement.

¶ 50 Because Salt Lake City's evidentiary arguments are either barred by the invited error doctrine or unsupported by the record, we reject the city's assertions of evidentiary error.

## CONCLUSION

¶ 51 None of Salt Lake City's arguments warrant reversal of the judgment in favor of Mr. Kerr. We therefore affirm.

Justice DURHAM authored the opinion of the Court, in which Associate Chief Justice NEHRING and Justice PARRISH joined. Justice LEE filed a concurring opinion, in which Chief Justice DURRANT joined.

Justice LEE, concurring in part and concurring in the judgment:

¶ 52 The question of the sufficiency of the evidence of notice to Salt Lake City implicates a series of decisions by the district court: its decision denying the City's motion for summary judgment, its decisions granting a directed verdict and then granting a new trial in the first trial, and its decision denying a directed verdict in the second trial. The majority reaches the merits of only the last of these decisions, concluding that the first two sets of decisions are unreviewable. I agree that the decision denying summary judgment is not appealable. *Supra* ¶ 29. I would deem the decision granting a new trial appealable, however.

¶ 53 As the majority acknowledges, this court has long upheld the appealability of decisions granting a new trial. *See Hirabelli v. Daniels*, 44 Utah 88, 138 P. 1172, 1173 (1914). Thus, while recognizing that review of such decisions might be unnecessary in light of the appealability of the judgment in

the second trial, we have held them reviewable on the basis of the downsides of such an approach. We have explained, specifically, that the failure to review an erroneous decision to grant a new trial could cause significant hardship not remedied by a subsequent appeal from the new trial. And we have noted that such hardship is rooted in the notion that a "whimsical" or "baseless" grant of a new trial would require "an aggrieved party" to be "compelled to accept what the court may choose to allow or impose upon him or abandon his cause or defense." *Id.*

¶ 54 The appealability of a decision granting a motion for new trial is well-rooted in our caselaw. And our cases have never suggested an exception to the rule—until now. In finding the new trial decision in this case unappealable, the majority establishes a broad exception to the general rule stated in our cases. Specifically, it holds that a new trial decision entered *before* a jury verdict is not appealable, asserting that "[t]he justification for reviewing the grant of a new trial motion ... is entirely absent" in such circumstances, and that "the grant of a new trial in these circumstances ... plac[es] the litigants in the same procedural position as if the prior aborted trial had never occurred." *Supra* ¶ 37. And the court analogizes the decision here to "the denial of a motion for summary judgment on evidentiary grounds," asserting that the "full and fair opportunity to litigate the facts in the second trial" render the basis for an appeal a nullity. *Supra* ¶ 37.

¶ 55 I see the matter differently. I would uphold and apply the rule of categorical appealability of a new trial decision as recognized in our caselaw. The basis for that rule is amply set forth in *Hirabelli*, in a manner foreclosing the exception announced by the court. And that rule in my view is worthy of stare decisis respect.

¶ 56 *Hirabelli* announced a clear rule of statutory construction. Under a statute providing that " 'upon an appeal from a [final] judgment, *all* orders, rulings, and decisions in the action or proceeding to which exceptions have been taken ... below ... are before the Supreme Court for review,' " the

*Hirabelli* court found "no good reason" for treating decisions granting a new trial as somehow excepted from the court's jurisdiction. 138 P. at 1173 (emphasis added) (citing UTAH COMP. LAWS § 3304 (1907)). Parties to litigation should be entitled to rely on the continued viability of that principle. Our appellate courts retain broad jurisdiction over final judgments, and that appellate jurisdiction encompasses all orders, rulings, and decisions that were properly preserved below. UTAH CODE § 78A–3–102(3)(j) (granting the Supreme Court jurisdiction over "orders, judgments, and decrees of any court of record over which the Court of Appeals does not have original appellate jurisdiction"). Under these longstanding principles of Utah law, Salt Lake City is entitled to appeal the decision granting Kerr's motion for new trial—as that decision has never (until today) been excepted from our jurisdiction.

¶ 57 In any event, I am unpersuaded by the majority's policy analysis. A decision granting a motion for new trial can have a substantial economic and practical impact on the parties. And that impact depends very little on whether the decision is rendered before or after an initial verdict. Thus, I cannot agree that a new trial order "plac[es] the litigants in the same procedural position as if the prior aborted trial had never occurred," or is somehow comparable to "the denial of a motion for summary judgment on evidentiary grounds." *Supra* ¶ 37. That may be true as a technical legal matter. But economically and practically, a new trial is enormously significant. In our current system, trial is terribly costly and time-consuming. A do-over on a trial can be devastating—substantially altering the dynamics and posture of the parties for settlement. Whether the decision is made before or after a verdict, it seems to me that a "whimsical" or "baseless"—and unreviewable—decision granting a new trial is problematic. *Hirabelli*, 138 P. at 1173. It should accordingly remain reviewable, as it has long been in our system.

¶ 58 I would accordingly review both the decision to grant a new trial and the decision denying the City's motion for directed verdict. And I would affirm—essentially on the grounds articulated by the majority, as the new trial motion and the directed verdict motion in this case raised nearly identical arguments.