**2024 UT App 58**

# THE UTAH COURT OF APPEALS

ALEXIS DOUTRE,
Appellant,
*v.*
BOX ELDER COUNTY, BRIGHAM CITY, UNION PACIFIC RAILROAD
COMPANY, AND UTAH DEPARTMENT OF TRANSPORTATION,
Appellees.

Opinion
No. 20220139-CA
Filed April 18, 2024

Second District Court, Ogden Department
The Honorable Noel S. Hyde
No. 180906306

Troy L. Booher, Beth E. Kennedy, and Taylor P.
Webb, Attorneys for Appellant

Susan Black Dunn, Attorney for Appellee
Box Elder County

Matthew D. Church and Adam D. Goff,
Attorneys for Appellee Brigham City

Gina M. Rossi, Attorney for Appellee Union Pacific
Railroad Company

Sean D. Reyes and Peggy E. Stone, Attorneys for
Appellee Utah Department of Transportation

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1     Seeking a thrill in a friend's Jeep, Alexis Doutre and her
friends decided to jump railroad tracks at a crossing on a country
road. This choice was ill-advised, as the Jeep crashed into a nearby
utility pole, causing Doutre serious injury. Doutre sued various

parties, including Box Elder County, Brigham City, Union Pacific Railroad Company, and the Utah Department of Transportation, alleging a number of claims, including (1) failure to investigate, remedy, or warn of unsafe conditions; (2) negligent design and maintenance; and (3) liability for maintaining an attractive nuisance. All of Doutre's claims were dismissed on summary judgment. Doutre appeals, and we affirm.

BACKGROUND

¶2     On the outskirts of Brigham City, Utah, lies 1500 North, a dirt and gravel road. As the road approaches some railroad tracks, it rises rather steeply at about a 10% incline and creates a ramp that allows a vehicle traveling at sufficient speed to experience a "roller-coaster feeling" or even become airborne.

¶3     Stop signs stand on both sides of the tracks, and the tracks are marked with standard railroad crossing signs. There is also a low under-clearance sign on the west side of the tracks to warn westbound drivers. The posted speed limit is 35 miles per hour for eastbound traffic and 25 miles per hour for westbound traffic.

¶4     On a Friday night in late February 2017, Doutre and four friends, all between fifteen and seventeen years old, decided to jump this crossing. They were riding in a Jeep driven by one of the friends (Friend). There was one passenger in the front, with the other three, Doutre included, in the back. None of them were wearing seatbelts. Doutre had been involved in this activity before this incident. In fact, about a week earlier, she had driven her mother's minivan out to jump this same crossing. However, Doutre did not tell her mother about the track jumping because she knew that her mother would have told her it was dangerous.

¶5     Friend first approached the tracks from the east, hitting the tracks at around 40 to 50 miles per hour—enough to get the tires "a little bit" off the ground. Friend then turned around and

approached the tracks from the west, this time traveling at 60 miles per hour. The Jeep became airborne and landed on the other side of the tracks, where Friend lost control of the vehicle and crashed into a nearby utility pole. Doutre was seriously injured. There was some speculation that the Jeep's wheel may have hit a pothole on landing, contributing to the loss of control.

¶6 Doutre filed a lawsuit, with claims divided among multiple parties, including Box Elder County (the County), Brigham City (the City), the Utah Department of Transportation (UDOT), and Union Pacific Railroad Company (Union Pacific).[1] Among her general allegations was that the railroad intersection "constituted a hazard" because its "steep grade," limited visibility, and the "condition of the road" made it "difficult for drivers to accurately assess the danger and properly maintain control of their vehicles." Doutre further alleged that the crossing lacked "adequate warning" to "alert drivers to [its] defective, unsafe and/or dangerous condition," that "multiple car wrecks and injuries had occurred at this location," and that "young drivers (minor children) were attracted" to the intersection. As relevant here, she asserted three claims for relief: (1) failure to investigate, remedy, or warn of unsafe conditions; (2) negligent design and maintenance; and (3) liability for maintaining an attractive nuisance. The district court dismissed all of Doutre's claims on summary judgment. We recount Doutre's claims, the responses, and the district court's disposition of the claims by party.

¶7 **The County:** Doutre alleged that the County owned 1500 North until about 80 feet east of the tracks, where it became Wilson Lane and was owned by the City. She claimed that the County, as the owner of the portion of the road in question, failed to maintain the road in a safe condition, including eliminating the

---

1. Doutre also sued Friend, Friend's mother, and PacifiCorp (the owner of the utility pole). These defendants settled with Doutre.

"steepness hazard" and the "potholes present in the dirt road." In a summary judgment motion, the County argued that under the Utah Governmental Immunity Act (UGIA), it was immune from suit because fixing the dangerous condition was a discretionary function, not a mandatory one. The County also argued that there was no evidence that a pothole caused the Jeep to swerve into the utility pole.

¶8     The court granted summary judgment. It first ruled that Doutre's argument that the County "breached its duty to maintain the road" failed "in the specific instance of the existence of potholes or other surface damage to the road affecting the vehicle, or that any particular pothole existed contemporaneously with the accident." The court concluded that although Doutre had "put forth evidence from witnesses," which Doutre alleged demonstrated "an issue of material fact, . . . this evidence, even viewed in the light most favorable to [Doutre] on that issue," was "insufficient to rise to the level of creating a factual issue that [would] survive summary judgment." Regarding the incline of the slope approaching the tracks, the court determined that Doutre's claims were barred by the UGIA because the County's maintenance of the road was a discretionary function. *See* Utah Code § 63G-7-201(4)(a).

¶9     **The City:** Doutre alleged that the City, as the owner of the land where the Jeep crashed, was responsible for maintaining a seven-foot-wide clear zone on the side of the roadway. The City failed in this duty, she alleged, by allowing the utility pole to be so close to the road. Doutre also claimed that the City failed to regrade and resurface the road—something it had a contractual obligation with the County to do—which should have eliminated the pothole that allegedly caused Friend to lose control of the Jeep when it landed.

¶10    In its summary judgment motion, the City argued that Doutre had presented no evidence as to which pothole caused the

Jeep to lose control on landing. Regarding the utility pole, the City acknowledged that it was within city limits but nevertheless alleged that the City had "nothing to do with" the pole. The pole was installed in 1984 outside of city limits, and it fell within city limits only after 2015 when the City annexed the land on which it sat: "[U]ltimate responsibility for the power pole, including its location, maintenance, and operation remains with PacifiCorp. There is no relationship between the City and the power pole beyond its innocuous inclusion in land annexed by the City in 2015."

¶11 The court granted summary judgment in the City's favor, ruling that Doutre's claim "that there existed a pothole of sufficient substance to cause the vehicle to swerve into the pole" could not "be reasonably inferred from the known facts that [were] not in dispute," explaining that it required "not only a reasonable inference, but pure speculation to arrive at the [conclusion] that there was . . . a pothole within the limits of [the] City . . . that caused the car to swerve into the pole."

¶12 With regard to the City's duty "to maintain the roadway based upon . . . an agreement" with the County, the court noted that the only available interpretation of the agreement, "established as undisputed" by the testimony of the City and the County, was "that the obligation for maintaining the roadway [was] the obligation of [the] County, at least until the . . . City limit." Thus, the court ruled that there were "insufficient facts . . . to suggest the extension of any general liability of maintenance for [the] City with respect to the . . . County roadway." Concerning the utility pole, the court ruled that even if the pole was too close to the road, there had "been no factual presentation to suggest that [the] City's actions or inactions in connection with that pole, for which there is no history of any problem at any time . . . since its placement, constitute[d] a violation of the requirement of reasonable diligence."

¶13   **UDOT:** Doutre alleged that UDOT, which is responsible for ensuring the safety of railroad crossings, was required to make the crossing safe or, if it was unable to do so, to close it.

¶14   In its motion for summary judgment, UDOT argued that it had not breached any duty to Doutre because its responsibility, which it had fulfilled, was limited to ensuring that "appropriate signage relating to the railroad crossing was in place." UDOT also argued that it owed no duty to Doutre under the attractive nuisance doctrine because UDOT was not a "possessor of land." Lastly, UDOT argued that it was "immune from suit under discretionary function immunity for decisions relating to railroad crossing improvements" under the UGIA.

¶15   In granting summary judgment in UDOT's favor, the court ruled that Doutre's claim of attractive nuisance failed because "UDOT was not a possessor of land where the accident occurred." Moreover, the court ruled that UDOT's role in "reviewing and regulating railroad crossings" was a "discretionary function protected by governmental immunity" under the test set forth in *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983).

¶16   **Union Pacific:** Doutre claimed that Union Pacific was negligent in failing to maintain the railroad crossing, including the sufficiency of the crossing signals and the incline of the road. In its motion for summary judgment, Union Pacific argued that there was no breach of duty in this case because Doutre assumed the risk when she engaged "in a dangerous activity which caused her injury" and it "is axiomatic that where a driver ignores traffic control devices, at the urging or acquiescence of their passengers, that they are at risk of being in an accident." Moreover, Union Pacific asserted that the attractive nuisance doctrine did not apply because Doutre could not "be considered a child in this context." In this respect, Union Pacific argued, "It is a well-established principle of tort law that a minor participating in an adult activity,

such as operating a motor vehicle, is held to the same standard of care as an adult. . . . The undisputed facts show that [Doutre] was a licensed driver who previously engaged in the same activity that led to the subject accident."

¶17 In granting summary judgment in favor of Union Pacific, the court ruled that Doutre had presented insufficient evidence "to establish that the railroad crossing was unreasonably dangerous" and it was therefore not liable for Doutre's negligence claim. Concerning the attractive nuisance claim, the court ruled that Doutre had "not produced sufficient evidence . . . to support a finding that the railroad had actual notice that kids were jumping the tracks," and, therefore, Union Pacific could not "be held liable under that doctrine."

¶18 Doutre filed a motion to reconsider, in which she presented evidence allegedly showing that the crossing was unreasonably dangerous. She argued that she had "produced evidence of [Union Pacific's] constructive knowledge, at the very least, that it knew about the dangerous condition, and that it knew the condition created an unreasonable risk of death or harm to children."

¶19 The court denied the motion, explaining that the duty of Union Pacific regarding the crossing "is only to eliminate those circumstances where there are more than ordinarily hazardous conditions" and that it was not persuaded "the arguments presented in this case . . . established the existence of . . . circumstances involving a more than ordinarily hazardous condition." More specifically, the court ruled that Union Pacific's "obligation to ameliorate hazardous conditions within the right-of-way [did] not extend to the requirement to make physical modifications to public roadways that also occupy the right-of-way." The court went on to state,

> And the [court] has not been presented with any
> factual evidence or any legal argument to support

the theory that a railroad has the duty, or even the legal right to make structural modifications to public roadways that happen to co-exist in its right-of-way. And that argument has not been effectively made by [Doutre]. And even though there is a general duty to eliminate hazardous conditions within the railroad's right-of-way, there has been a lack of either a factual showing or a legal argument presented that would suggest the right or duty of [Union Pacific] to make such structural changes to public roads.

¶20 Doutre appeals.


ISSUES AND STANDARDS OF REVIEW

¶21 First, Doutre contends that "the district court failed to apply the summary judgment standard and construe the evidence in the light most favorable" to Doutre when it ruled that there was insufficient evidence of negligence for dangerous conditions that caused the accident, specifically the slope of the road and the presence of potholes.

¶22 Second, Doutre argues that the court erred in ruling—on summary judgment and on the motion to reconsider—that the attractive nuisance doctrine did not apply to Doutre's claims against UDOT and Union Pacific.

¶23 Third, Doutre claims that the court erred in ruling on summary judgment that the City did not breach its duty by allowing the utility pole to remain so close to the road.

¶24 A "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). And we review a court's grant of

summary judgment for correctness, giving the district court's decision no deference. *Stafford v. Sandy Paydirt LLC*, 2022 UT App 76, ¶ 7, 514 P.3d 157.

¶25 We review a district court's decision not to contemplate the merits of a motion to reconsider its previous summary judgment decision for abuse of discretion. *See Koerber v. Mismash*, 2015 UT App 237, ¶ 15, 359 P.3d 701 ("We review a district court's decision to deny a motion to reconsider a summary judgment decision for an abuse of discretion."). However, when a district court decides to address a motion to reconsider on its merits and revisits the substance of a previous summary judgment decision, we review the court's subsequent merits decision for correctness. *See Radakovich v. Cornaby*, 2006 UT App 454, ¶ 3, 147 P.3d 1195 ("In reviewing [motions to reconsider], we accord no deference to the trial court's conclusions of law but review them for correctness." (cleaned up)).[2]

ANALYSIS

I. The Condition of the Crossing

¶26 Doutre first claims that the district court improperly applied the summary judgment standard. More specifically, Doutre challenges the court's ruling that (1) Union Pacific could not be liable because Doutre had presented no evidence that the crossing was more than "ordinarily hazardous," (2) the County could not be liable because Doutre could not establish that a pothole contributed to her injuries, and (3) the City could not be liable because Doutre had not presented evidence that the city was responsible to fix the potholes. Doutre argues that she

---

2. Doutre filed several other motions for summary judgment, which were denied. She does not challenge their denial, and thus any factual disputes or assertions of additional facts raised therein are irrelevant for our purposes.

"presented more than sufficient evidence to survive summary judgment on each of these claims." And she asserts that "the potholes were not the only basis" for the County's liability; in addition to the potholes, Doutre contends that the road's excessive steepness created a "dangerous ramp."

¶27 Even if we assume, without deciding, (1) that the road was more than ordinarily hazardous due to its steepness and (2) that there were potholes present, we see no error in the district court's summary judgment ruling in favor of the County, the City, and Union Pacific on these claims. We address the steepness of the road and the potholes as they apply to the relevant defendants in turn.

A. The Incline of the Road

1. Union Pacific

¶28 With regard to Union Pacific's responsibility to ameliorate the steepness of the road as it approached the crossing, we agree with the district court's assessment that no evidence was presented, nor legal argument made, to establish that Union Pacific had a legal duty—or even the right—to modify a public roadway.

¶29 Doutre argues that Union Pacific mistakenly asserts that the "court ruled that Union Pacific had no right or ability to fix the hazard." She contends that "the court made no such ruling" and instead ruled "only that there was no evidence that Union Pacific had the right or ability to fix the hazard." But as confirmed by the express statement of the court when denying Doutre's motion to reconsider, Doutre is the one who is mistaken:

> The ruling of the Court is that [Union Pacific's] obligation to ameliorate hazardous conditions within the right-of-way does not extend to the requirement to make *physical modifications to public*

*roadways* that also occupy the right-of-way. The purpose of the provision requiring a railroad to eliminate hazardous conditions within its right-of-way deals with, most specifically, circumstances *other than* public roadways.

(Emphasis added.)

¶30 The court then went on to explain that Doutre had not presented "any factual evidence *or any legal argument* to support" a contrary conclusion, namely, "the theory that a railroad has the duty, or even the legal right to make structural modifications to public roadways that happen to co-exist in its right-of-way." (Emphasis added.) The argument, the court stated, had "not been effectively made by" Doutre. In sum, the court said that whether Union Pacific had "any legal ability to make structural changes to the roadway" was simply "not present in the evidence *or in the legal presentation*." (Emphasis added.)

¶31 Even on appeal, Doutre does not address the district court's well-reasoned ruling. Instead, she limits her arguments to asserting that she presented sufficient evidence of the dangerous design of the crossing to survive summary judgment. Even if this premise is accurate, it does not relieve her of the duty to address the court's legal reasoning and conclusion that Union Pacific had no duty or legal right to make structural modifications to the public roadway. It is well settled that appellants who fail to "address the district court's reasoning" also fail to carry their "burden of persuasion on appeal." *Federated Cap. Corp. v. Shaw*, 2018 UT App 120, ¶ 20, 428 P.3d 12. "Accordingly, we conclude that [Doutre] has not demonstrated that the district court erroneously granted" summary judgment in favor of Union Pacific on this point. *Id.*; *see also Bad Ass Coffee Co. of Haw. v. Royal Aloha Int'l LLC*, 2020 UT App 122, ¶ 48, 473 P.3d 624 (explaining that an appellant who "does not acknowledge the district court's reasoning" and "explain why the court was wrong" fails to carry

its burden to show that the court erred with respect to a challenged decision).

2.    The County

¶32    In granting summary judgment in favor of the County, the court ruled "that the specific maintenance and both determination and continuation of a particular grade or incline to a railroad crossing is not simply the maintenance of a roadway, but that it does require the exercise of a discretionary function." In reaching this determination that addressing the "grade or incline" of the road at the crossing was a "discretionary function," the court relied on the four-part test provided in *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983).

¶33    The UGIA broadly grants immunity "from suit for any injury that results from the exercise of a governmental function." Utah Code § 63G-7-201(1). And a governmental function is defined as "each activity, undertaking, or operation of a governmental entity." *Id.* § 63G-7-102(5)(a). Governmental entities "retain immunity from suit unless that immunity has been expressly waived" by the UGIA. *Id.* § 63G-7-101(3). One such express waiver is for "any injury caused by . . . a defective, unsafe, or dangerous condition of any highway, road, . . . or other structure located on them." *Id.* § 63G-7-301(2)(h)(i). However, notwithstanding this express waiver for roads, immunity is nevertheless retained—under an exception to the waiver—for the exercise of discretionary functions:

> A governmental entity, its officers, and its employees are immune from suit, and immunity is not waived, for any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or results from . . . the exercise or performance, or the failure to exercise or

perform, a discretionary function, whether or not the discretion is abused . . . .

*Id.* § 63G-7-201(4)(a).

¶34 In *Little*, on which the district court relied, the Utah Supreme Court adopted a four-part test for determining whether a governmental function is discretionary and thus subject to governmental immunity:

> To be purely discretionary, an act by the state must be affirmed under four preliminary questions:
>
> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?
>
> (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?
>
> (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?
>
> (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

667 P.2d at 51 (cleaned up).

¶35 In applying this test, Utah courts have focused on whether the function requires evaluation and judgment to implement

policies. While acknowledging that "'discretionary function' is not susceptible to precise definition in all legal contexts," our supreme court has "held that discretionary functions are those requiring evaluation of basic governmental policy matters and do not include acts and decisions at the operational level—those everyday, routine matters not requiring evaluation of broad policy factors." *Nelson ex rel. Stuckman v. Salt Lake City*, 919 P.2d 568, 575 (Utah 1996) (cleaned up). In other words, "[d]iscretionary immunity is a distinct, more limited form of immunity and should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function." *Id.* And "the relevant question asks whether the discretionary act occurred at the operational level or required evaluation of broad policy factors." *Faucheaux v. Provo City*, 2015 UT App 3, ¶ 36, 343 P.3d 288 (cleaned up), *cert. denied*, 352 P.3d 106 (Utah 2015).

¶36　For example, in *Duncan v. Union Pacific Railroad Co.*, 842 P.2d 832 (Utah 1992), our supreme court concluded "that UDOT's decision to defer improving the adequacy of warning devices at a [railroad] crossing" was a discretionary decision rather than an operational one. *Id.* at 835. The court observed that UDOT utilized "a surveillance team to evaluate the level of the hazards to motorists at hundreds of crossings where active warning devices are not in place." *Id.* Based on this evaluation, UDOT assigned priority "to those crossings where the greatest hazards" existed, upgrading "the warning devices at those crossings with the highest priority until the limited available funds [had] been exhausted." *Id.* Upgrading crossings "with a lower priority" would wait for future funding. *Id.* Indeed, the *Duncan* court's reasoning echoed the reasoning of this court, which it was affirming: "Highway maintenance and improvement are predominately fiscal matters. Every highway could probably be made safer by further expenditures, but we will not hold UDOT (and implicitly, the legislature) negligent for having to strike a difficult balance between the need for greater safety and the burden of funding improvements." *Duncan v. Union Pac. R.R. Co.*,

790 P.2d 595, 601 (Utah Ct. App. 1990) (cleaned up), *aff'd*, 842 P.2d 832 (Utah 1992); *see also Gleave v. Denver & Rio Grande W.R.R. Co.*, 749 P.2d 660, 669 (Utah Ct. App. 1988) (determining that the obligation of UDOT to "install different safety signals or devices at the subject crossing was a purely discretionary function"), *cert. denied*, 765 P.2d 1278 (Utah 1988).

¶37　Doutre argues that the County "failed to satisfy its burden to show" that addressing the incline of the road "was in fact the subject of intense scrutiny and review" necessary to establish that the function was discretionary. (Quoting *Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 31, 986 P.2d 752.) But Doutre does not give fair reading to the County's undisputed facts. In its motion for summary judgment, the County explicitly argued that improvement to the road was a discretionary function:

> The ability to grade or alter the road is dependent on [the] County's ability to pay for such a venture. The crossing . . . does not qualify for State or Federal funds for the purpose of improvement projects. Therefore, it is entirely dependent on County funds. As shown in the Statement of Undisputed Facts, the Box Elder County Commission [(Commission)] designates its limited funds to provide grading of its gravel roads and to maintain the warning signs along 1500 North. This decision requires the exercise of basic policy judgment and the . . . Commission clearly has the lawful authority and duty to make the decision.

¶38　And in its motion for summary judgment, the County referenced specific evidence to support this position that addressing the incline of the road was discretionary. Citing evidence produced during discovery, the County stated that the crossing in question was not assigned priority by UDOT and it therefore did "not qualify for State or Federal funds for the

purpose of improvement." Moreover, the statement of facts indicated that UDOT had funding to improve only about four crossings a year from among the top twenty-five prioritized crossings and that the crossing in question was ranked 426 on the list. In terms of its own resources committed to road maintenance, the County stated that budget figures are presented to the county auditor, after which they are forwarded to the Commission. Then the superintendent of the road department meets with the Commission to discuss the proposed budget—which is about $5 million annually—before the "Commission reviews, considers and adopts or rejects items and/or expenditures by line-item." Moreover, "specific requests for allocation of funds must also be presented for approval by the Commission." If the roads department exceeds "its budget, the Commission [has] to advertise a public meeting to open the County's budget, or increase taxes." The County also averred that its budget for the road department had a line item for the "[m]aintenance and grading" of dirt and gravel roads. It is obvious that the County was not referring to the incline of the road by its use of the word "grading" but to the annual surface smoothing of unpaved roads "after the frost is out of the ground."[3] Thus, the County's undisputed facts establish that modifying the road to address its steep incline was not a normally budgeted item and that, depending on the expense of the project, modifying the incline would require special approval of the Commission and possibly

---

3. "Grading involves the reshaping of the traveling surface through removal of all potholes and/or washboards and the re-establishment of the crown of the unpaved road. Grading is performed by a motor grader that cuts the surface of the unpaved road to the bottom of the potholes and/or washboards and then spreads the material across the surface of the roadway." Fed. Highway Admin., U.S. Dep't of Transp., *Gravel Roads Construction & Maintenance Guide* 133 (2015) https://www.fhwa.dot.gov/construction/pubs/ots15002.pdf [https://perma.cc/RES7-XYUG].

a public meeting to open the budget for the allocation of such funds.

¶39    This is the very type of governmental function that our caselaw identifies as discretionary. Finding funding to modify the incline of the road would likely require the County to go through a process of evaluation, judgment, and policy implementation. Reconstructing the road—given the County's budget constraints and processes—would certainly not be an act or decision belonging to "the operational level" and involving "everyday, routine matters not requiring evaluation of broad policy factors." *Nelson ex rel. Stuckman*, 919 P.2d at 575 (cleaned up). The road could potentially have been made safer by additional expenditures. But finding money to do that is a classic example of a fiscal matter that falls squarely within the confines of a governmental discretionary function. *See Duncan*, 790 P.2d at 601. Accordingly, we see no error in the district court's conclusion on summary judgment that the County enjoyed governmental immunity for liability related to the incline of the road.[4]

---

4. To be clear, our analysis as to the exercise of a discretionary function is limited to the County's involvement in addressing the incline of the road. As explained below, we resolve the issue of the potholes in a different fashion.

Doutre also suggests that the County had a duty to remove the utility pole, while acknowledging that at the time of the accident the land was no longer on county property. But apart from mentioning this alleged duty in passing at several points in her opening brief, she develops scant argument specifically addressing this issue as it relates to the County. Doutre appears to have recognized this problem by the time she filed her reply brief, where she again mentions the County's duty several times in passing and asserts, "The County does not respond to the argument that it was required to remove the utility pole." In fact,

(continued…)

B.      The Potholes

¶40     Doutre presented little evidence that the road's potholes caused the crash that resulted in her injuries. Indeed, the evidence presented was that potholes were not shown to be an identifiable factor in the crash. Nor could a reasonable inference be made that any pothole was a factor in the crash. Thus, establishing a nexus between the potholes and the crash would require speculation.

¶41     An officer who investigated the crash testified that he did not "recall any snow or ice on the road" and that he did not "specifically remember potholes, short of [the] rough road." When asked if potholes contributed to the crash, the officer stated, "I couldn't say whether the potholes affected it specifically. . . . I wasn't there to see how the vehicle landed and the course it took and if the pothole maybe altered the steering. I'd have to speculate on that."

¶42     The passengers and driver offered nothing but speculation on the connection between the potholes and the crash. One of the passengers in the Jeep equivocated when offering his "opinion" about the effect of potholes on the crash, testifying that he "thought" the Jeep "might have hit a pothole" but he did not know which wheel hit it. Nevertheless, he speculated that "the

---

it seems likely that the County didn't respond to the argument because the argument was so obliquely raised, making it rather difficult to discern. Thus, we do not see this as a deficiency on the part of the County but on the part of Doutre. Because Doutre's potential arguments regarding the County's duty to address the utility pole are inadequately briefed, we decline to address this issue further, apart from observing that moving the utility pole would likely fall under the discretionary function rubric discussed above. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

front [of the Jeep] probably hit some potholes because . . . there's a lot of potholes going up to that railroad." However, he clarified that he did not have "any concerns" about the potholes "[o]ther than they're a little bumpy." And the other passengers did not identify a pothole as causing the crash. One said that while the road was wet and had potholes, the Jeep simply "drifted off" the road after "[o]ne wheel hit first and caused" them to "swerve" into the utility pole. Another stated that the accident happened because there was "a lot of loose gravel" where they landed and they "were just going too fast." And while Friend testified that the road had potholes, she did not offer any testimony that she hit one of them.

¶43    Doutre's experts were equally equivocal about the nexus between the potholes and the accident. One of her experts testified in his deposition, "[F]rom reading the testimony of the passengers in the vehicle, . . . apparently . . . there are lots of potholes on this roadway." This expert went on to observe, "It was mentioned by several of the parties in the car that the Jeep hit a pothole. And after hitting the pothole, it seemed to veer off to the right in which case it hit the utility pole." This expert also stated that a "pothole is more than just a problem, an imperfection in the roadway, it's also a hazard." He then speculated, "And that pothole and the maintainability of this roadway could have directly . . . resulted in that car hitting that utility pole." But, importantly, when the expert was asked if he had "anything other than the testimony that there might have been a pothole" or that "the Jeep ever struck a pothole," he avoided giving a direct answer. This expert was further asked if he saw any photographs of "any actual potholes that were hit" by the Jeep. He responded that "it could have been in there but it was almost impossible to see" because the "pictures were so dark."

¶44    Another expert wrote—without any supporting analysis as required by the Utah Rules of Evidence—that "[p]otholes in the road were what likely caused the vehicle to veer to the right and

strike the power pole" and that it was "the speed, high grade, uneven roadbed, and fixed object in the clear zone that led to this injury accident." *See* Utah R. Evid. 702(b) ("Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts."). This expert did not identify the location of the purported accident-causing pothole, and thus he did not identify where—on city versus county property—the pothole existed such that a jury could evaluate which party might potentially be liable for its existence.

¶45    While Doutre certainly presented evidence that the road had potholes near the crossing, she presented scant evidence—apart from isolated speculation based on the vague memories of one passenger and her experts' parroting of the passenger speculation—that the potholes caused the crash. Moreover, as the County points out, "Doutre presented no evidence regarding any specific information about the potholes, including . . . location, diameter, depth, substance (mud, dirt, gravel, snow, or ice). There was no evidence regarding skid marks, landing marks, or other debris at or near potholes."

¶46    And Doutre needed more than mere speculation. We have repeatedly noted that while "entitled to all favorable inferences," a non-moving party "is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 7, 264 P.3d 752 (cleaned up); *accord Kranendonk v. Gregory & Swapp, PLLC*, 2014 UT App 36, ¶ 15, 320 P.3d 689, *cert. denied*, 329 P.3d 36 (Utah 2014). "In essence, the parties must submit admissible evidence to present an issue of material fact," and "unsubstantiated conclusions and opinions are inadmissible." *JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, ¶ 15, 378 P.3d 131 (cleaned up). Another way of expressing this dynamic is there must be a "genuine issue of material fact" in

play for a non-moving party to survive summary judgment. *See Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (cleaned up). "The word 'genuine' indicates that a district court is not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party. Instead, it is required to draw all *reasonable* inferences in favor of the nonmoving party." *Id.* ¶ 21 (cleaned up).

¶47 Thus, we perceive no error in the district court's conclusion that Doutre's "articulation of speculation or possibility [did] not rise to the level of creating a factual issue that [would] survive summary judgment." We agree with the court's assessment that Doutre presented insufficient evidence of the "existence of any particular pothole or that the vehicle actually was affected by any particular pothole, nor [was] there any evidence contemporaneous with the accident that any particular pothole existed." The most that Doutre's expert was able to say in this respect is that a pothole "could have been in there." But such vague and unidentifiable conjecture about what "could have" caused the accident is not enough to survive summary judgment, for when "the proximate cause of an injury is left to speculation, the claim fails as a matter of law." *Clark v. Farmers Ins. Exch.*, 893 P.2d 598, 601 (Utah Ct. App. 1995) (cleaned up) (holding that summary judgment was appropriate where experts could not identify the mechanism of causation). The evidence Doutre presented shows that there were potholes along the stretch of road where the Jeep landed, but this evidence merely suggests that the driver *could* have hit a pothole on landing and that the pothole *could* have caused the car to veer to the right. General statements that the road may have had potholes around the tracks or that the road was bumpy with loose gravel simply don't create a factual dispute about potholes causing the accident. Rather, that is nothing more than speculation compounding speculation, and Doutre needs more than that to meet her burden to establish a prima facie case that the County or the City were negligent in

failing to address the pothole problem that allegedly led to her injuries.

## II. Attractive Nuisance

¶48    Doutre next claims that the district court erred in ruling that UDOT and Union Pacific were not liable for the railroad crossing under the attractive nuisance doctrine.[5]

¶49    The Utah Supreme Court "expressly adopted" section 339 of the Restatement (Second) of Torts "as the complete statement of the attractive nuisance doctrine in our jurisprudence." *Colosimo v. Gateway Cmty. Church*, 2018 UT 26, ¶ 27, 424 P.3d 866 (cleaned up). That section provides,

> A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
>
>> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

---

5. With respect to UDOT, Doutre also argues that the district court erred in concluding that it was immune from suit under the UGIA. But because Doutre argues—at least insofar as we can divine from her briefing—that UDOT's *liability* arose only with regard to maintaining an attractive nuisance and because we conclude that no duty arose under the attractive nuisance doctrine, we need not address governmental immunity claims with respect to UDOT. However, if we were to consider that issue substantively, UDOT's responsibility to eliminate the steepness of the road's incline would, like the County's, certainly be an exercise of a discretionary function and thus protected by governmental immunity.

> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and
>
> (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
>
> (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and
>
> (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

Restatement (Second) of Torts § 339 (Am. L. Inst. 1965).[6]

---

6. It might be difficult to see how Doutre—or the other occupants—were trespassers since they were using a public road. *See* Restatement (Second) of Torts § 329 ("A trespasser is a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise."). But under the attractive nuisance doctrine, a possessor of land is still subject to liability even if the child is on the land as a licensee or an invitee. *See id.* § 343B ("In any case where a possessor of land would be subject to liability to a child for physical harm caused by a condition on the land if the child were a trespasser, the possessor is subject to liability if the child is a licensee or an invitee.").

¶50 Doutre's attractive nuisance claims fail as a matter of law owing to a fact about which there is no dispute: Doutre and Friend were licensed drivers. And when minors take part in adult activities, like driving, they are held to an adult standard of care. Indeed, it is a "well-established principle of tort law that a minor participating in an adult activity, such as operating a motor vehicle, is held to the same standard of care as an adult." *Summerill v. Shipley*, 890 P.2d 1042, 1044 (Utah Ct. App. 1995). Thus, Doutre was required to conform her "conduct to the standard of care required of the ordinary, prudent *adult* driver." *Id.* at 1045.

¶51 Doutre argues in response, "This authority is inapplicable because [Doutre] was not driving. Instead, she was riding in a car after consenting to track jumping. This is precisely the sort of circumstance in which the attractive nuisance doctrine is designed to apply. The doctrine protects minors 'from their childish lack of attention and judgment.'" (Quoting Restatement (Second) of Torts § 339 cmt. i.)[7] But even though Doutre was not driving, she is not excused from being aware of the knowledge she has as a driver. Put simply, Doutre does not qualify as someone who, because of her youth, does not "realize the risk involved" with jumping railroad tracks or coming into contact with a gravel road after having jumped those tracks. *See* Restatement (Second) of Torts

---

7. We can only imagine the landslide of litigation that would descend upon us if teen drivers and passengers were excused, because of their youth, from the standard of care applicable to all drivers. Any open stretch of road, particularly every downhill grade in mountainous Utah, could be deemed an attractive nuisance because it might entice minor drivers to speed and so create an "unreasonable risk of death." *See* Restatement (Second) of Torts § 339(b) (Am. L. Inst. 1965). Under Doutre's logic, there would scarcely be an aspect of road construction that would not be an inchoate attractive nuisance claim. And we are simply unwilling to sign on to such an approach.

§ 339(c). She was a licensed driver and was hence presumed to exercise the prudence of an adult driver. Moreover, Doutre admitted that she was very much aware of the potential danger of jumping the tracks when she had consciously avoided telling her mother about taking the family minivan to participate in the activity. Accordingly, the attractive nuisance doctrine is a poor fit for Doutre's conduct as a licensed driver, and the district court did not err in granting summary judgment in favor of UDOT and Union Pacific on Doutre's attractive nuisance claims.[8]

### III. The Utility Pole

¶52 Doutre asserts that the district court erred in ruling that the City had no duty to move the utility pole. Specifically, she argues that under the Utah Administrative Code, the City was required

---

8. The district court concluded that the attractive nuisance doctrine did not apply to UDOT and Union Pacific for other reasons. For UDOT, the district court determined that the doctrine was inapplicable because the entity was not a possessor of land. And for Union Pacific, the court ruled that the doctrine did not apply because the railroad did not have notice of the danger. We also determine that the doctrine does not apply as a matter of law but because of the licensed-driver status of Doutre and Friend. It is well-established that "an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record." *Bailey v. Bayles*, 2002 UT 58, ¶ 20, 52 P.3d 1158.

As an aside, we have reservations about the applicability of the attractive nuisance doctrine to Doutre as a minor passenger. It seems odd to piggy-back an injured minor's negligence claim for attractive nuisance on another person's participation in a dangerous activity. Nevertheless, we have analyzed this issue—as the parties have proceeded on appeal—under the assumption that the doctrine applies.

to ensure that the pole was at least seven feet from the edge of the road.[9]

¶53    We perceive no error in the district court's determination that even if the pole was too close to the road, Doutre had failed to produce evidence the City violated the reasonable diligence standard in allowing it to remain in place.

¶54    In an old case, our supreme court clarified that a municipality must exercise reasonable diligence to ensure that poles on the margins of streets are reasonably safe: "If a mere stranger . . . erected a large pole 60 or 70 feet in height in the margin of the street" such that it was "a menace to others, it would have been the duty of the city to exercise reasonable diligence to discover it, and to exercise ordinary care to remove it or to make it reasonably safe." *Morris v. Salt Lake City*, 101 P. 373, 377–78 (Utah 1909). Thus, after it had annexed the property, the City had a duty to "exercise reasonable diligence" to discover the presence of the pole and take steps "to make it reasonably safe." *Id.* at 378.

¶55    Here, the pole had been installed by the power company in 1984 on unincorporated property of the County. The property on which the pole stood was annexed by the City in 2015, meaning that the pole was within the City's jurisdiction for only about eighteen months before the accident. The record contained no

---

9. "The horizontal location of utility facilities and appurtenances within the right of way shall conform to the current edition of the AASHTO Roadside Design Guide." *See* Utah Admin. Code R930-7-8(1)(a)(iv). "AASHTO is the American Association of State Highway and Transportation Officials, which publishes guidelines to highway agencies to promote adequate highway design and highway safety." *Johnson v. State*, 275 So. 3d 879, 889 n.3 (La. Ct. App. 2019). According to one of Doutre's experts, under AASHTO standards, "the clear zone for this type of road is seven feet."

evidence that the City was made aware of any dangerous condition regarding the pole. The district court summarized the facts as showing that (1) the pole had been in place for "nearly 40 years"; (2) by the "best estimate" of Doutre's counsel, the pole was "one-foot in deviation from a stated standard"; (3) there was "no indication of any information ever being provided" to the City "with respect either to that deviation or any concerns about the location of the pole or any prior history of problems with respect to that pole"; and (4) there had been "no factual presentation to suggest" that the City's "actions or inactions in connection with that pole . . . constitute violation of the requirement of reasonable diligence." The district court concluded that, "based upon the facts, even when viewed in [a] light most favorable to [Doutre's] position," the "legal standard [was] not maintained."

¶56　We agree with the district court's conclusion. Given these facts, this is a case where reasonable minds cannot differ that the City did not fail to act with reasonable diligence in discovering a problem with the pole's location. *See generally Davis v. Wal-Mart Stores Inc.*, 2022 UT App 87, ¶ 27, 514 P.3d 1209 ("[S]ummary judgment is appropriate when reasonable minds cannot differ about whether the defendant's actions violated the duty of reasonable care."), *cert. denied*, 526 P.3d 827 (Utah 2022). The pole fell within the City's jurisdiction only eighteen months before the accident, and there was no evidence that the City was ever made aware of safety problems with the placement of the pole being too close to the road generally or that it did not satisfy AASHTO standards specifically. *See supra* note 9. In other words, there is no evidence in the record that the pole's location was obviously problematic or even abnormally out of place. Doutre's argument seems to suggest that when this area was annexed by the City, the City had a duty to explore the entirety of the expanse, measuring tape in hand, and verify compliance with all applicable standards. Such a high expectation exceeds the reasonable diligence that the law actually imposes on municipalities. Accordingly, we find no error in the district court's conclusion on summary judgment that

Doutre failed to show, as a matter of law, that the City failed to exercise reasonable diligence.

## CONCLUSION

¶57    For the foregoing reasons, we hold that the district court's grant of summary judgment was sound in each particular issue on appeal.

¶58    Affirmed.

———————