2026 UT App 50

# THE UTAH COURT OF APPEALS

MOHAMED OSMAN ABDELGADER,
MARIAM HAMID, AND DINA LUKA,
Appellants,
*v.*
UTAH DEPARTMENT OF TRANSPORTATION,
Appellee.

Opinion
No. 20240638-CA
Filed April 2, 2026

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 200906404

Sherri L. Walton and Diana J. Huntsman,
Attorneys for Appellants

Derek E. Brown and Peggy E. Stone,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Ahmed Abdelgader died from injuries sustained in a traffic accident on a highway in northern Utah. Following Abdelgader's death, Mohamed Osman Abdelgader, Mariam Hamid, and Dina Luka (collectively, the Estate) filed a wrongful death action against the Utah Department of Transportation (UDOT). UDOT moved for summary judgment, arguing that under the Governmental Immunity Act of Utah (the Act), it was immune from suit. The district court granted UDOT's motion. The Estate now appeals, and we affirm.

## BACKGROUND[1]

*The Accident*

¶2    On October 10, 2018, Abdelgader, a licensed commercial truck driver, was hauling a fully loaded trailer northbound on US-89 (the highway) up through Logan Canyon and down toward Garden City, Utah. During the descent from the summit of the canyon into Garden City, Abdelgader experienced "brake fade" from overheated brakes.[2] As a result, he was unable to bring the truck to a stop at the bottom of the hill at the T-intersection of the highway and SR-30, and the trailer overturned and slid into a building. Abdelgader was fatally injured in the crash and died a short time later.

*The Summit to Garden City Project*

¶3    Between 2000 to 2004, UDOT designed and planned an improvement project on a portion of the highway, called the Summit to Garden City Project (the Project). The purpose of the Project was to bring that stretch of "the highway up to current

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Genesis Aggregates B, LLC v. Toll Sw. LLC*, 2025 UT 28, n.2, 574 P.3d 87 (quotation simplified).

2. Brake fade "is the reduction in stopping power that can occur after repeated or sustained application of the brakes of a vehicle, especially in high load or high speed conditions. . . . Brake fade is caused by a buildup of heat in the braking surfaces and the subsequent changes and reactions in the brake system components . . . . Brake fade occurs most often during high performance driving or when going down a long, steep hill." *Brake fade*, Wikipedia, https://en.wikipedia.org/wiki/Brake_fade [https://perma.cc/K9RF-W6KW].

standards." Randy Jefferies was UDOT's design engineer of record for the Project.

¶4     The highway has a long history of controversy between groups opposing further highway construction (on grounds of environmental and aesthetic harm) and construction proponents seeking changes (for better safety and utility of the road). Before designing the Project, UDOT conducted an environmental impact study, which was completed in 1994. During an environmental impact study, "the purpose and need for [a] project" along with "the potential environmental impacts" of the project are identified. Alternatives that will "meet [the] purpose and need" of the project are also identified, including "a preferred alternative." An evaluation of "safety features" is conducted "[a]s part of identifying the needs for the project." This part of the evaluation typically looks at "crash data" and "traffic volume data" and "reviews highway geometry to identify substandard elements."

¶5     After the environmental impact study in this matter was completed, a final environmental impact statement (the EIS) was published. The EIS "identified the scope of the [P]roject" and "was quite detailed as to which improvements would be made and what direction the design should take." The identified improvements "included reconstructing the road, widening the pavement, [and] addressing and correcting the tight curves." The following year, in 1995, the EIS was approved by UDOT, the Federal Highway Administration (the FHWA), and the United States Forest Service through a record of decision (the ROD) as the "preferred alternative" for the Project.

¶6     For nearly the next decade, various groups met to design the Project. The EIS and the ROD served as "a starting point" for the Project's design. The Project's design had to comply with the guidance in the EIS and the ROD or "have less impacts."

¶7     In October 2002, experts from UDOT's various departments conducted a "scoping meeting" to determine what "the more specific needs of [the Project] would be, taking the [EIS]

as the starting point." UDOT's experts were tasked with evaluating traffic information and crash data, and based on those evaluations, the experts recommended that certain design elements be included in the scope of the Project. Jefferies was then responsible for ensuring that "whatever scope [was] designed [met] the AASHTO standards."[3]

¶8 In November 2002, UDOT conducted a public meeting and collected numerous comments regarding the anticipated construction. That same month, a Cooperating Advisory Team comprised of representatives of federal, state, and local agencies, as well as private stakeholders and advocacy groups, was assembled to discuss the Project's design and obtain input. In early 2003, UDOT conducted an "alternative review meeting" to discuss alternatives to design issues and "narrow the field to one or two for each section" to present to the Cooperating Advisory Team for a final decision.

¶9 In January 2004, an Operational Safety Report evaluating the accident history on the relevant portion of the highway was completed for the three-year period of 2000 through 2002. In March 2004, the FHWA and UDOT completed a re-evaluation of the EIS. As part of this evaluation, all "current AASHTO [and] UDOT standard[s] [were] considered."

¶10 The Project's final design did not include a runaway truck ramp. Jefferies explained that based on the crash data that had been collected and "reviewed throughout the environmental process as well as later reviews," there were "no indications" found by UDOT's traffic safety division that such a ramp was needed.

---

3. "AASHTO is the American Association of State Highway and Transportation Officials, which publishes guidelines to highway agencies to promote adequate highway design and highway safety." *Doutre v. Box Elder County*, 2024 UT App 58, ¶ 52 n.9, 548 P.3d 914 (quotation simplified), *cert. denied*, 554 P.3d 1096 (Utah 2024).

*The Highway Safety Improvement Program*

¶11 UDOT participates in the FHWA Highway Safety Improvement Program (HSIP) "to fund projects that advance roadway safety goals in Utah." "[T]he purpose of the HSIP is to achieve a significant reduction in traffic fatalities and serious injuries on all public roads . . . through the implementation of infrastructure-related highway safety improvements . . . ." The HSIP is "the primary source" of funds for UDOT's safety improvement projects. HSIP funds are limited. Prior to 2018, the UDOT region where the highway is located had a $4 million to $5 million annual budget for HSIP projects. While UDOT is accountable to the FHWA for ensuring that HSIP funds are used properly, UDOT is "given considerable flexibility to determine how to best implement the HSIP." There is no evidence that HSIP funds are rolled over from year to year.

¶12 HSIP infrastructure projects are planned, analyzed, prioritized, programmed, implemented, and evaluated in a six-step process that involves collaboration between the UDOT Traffic & Safety Division, the FHWA, UDOT region offices, and other public and private stakeholders. Potential safety projects are identified in the first step of this process—the "Planning" step.

¶13 The initial tasks in the Planning step include "the collection and analysis of crash, traffic, and roadway attribute data, as well as solicitation of locations from the UDOT region offices and other safety partners." UDOT uses statewide "hot spot and systemic modeling to pinpoint locations where crashes have occurred or where the models suggest crashes are likely to occur in the future." Determinations as to which projects to fund are not made in this initial step.

¶14 The second step of the HSIP funding process is the "Analysis" step. Here, each potential project location is subject to a "more extended analysis." "Benefit-to-cost ratios are calculated for each location based on the crash history, the expected decrease

in crashes for a potential mitigation measure, and the cost of that mitigation measure."

¶15    Projects that make it past the Analysis step move to the "Prioritization" step. Projects are prioritized based on several factors, including "greatest benefit to reduce fatal and serious injury crashes," "benefit-to-cost ratio," "timeline to completion," and "coordination with other projects."

¶16    Thereafter, projects move through the final three steps: "Programming," "Implementation," and "Evaluation." These steps include assigning the project "to the three-year planning horizon," designing and constructing the project, and analyzing crash data after the completion of the project.

¶17    Prior to 2018, no potential truck safety improvement projects on the highway were identified or analyzed by UDOT.

*The Estate Files Suit*

¶18    In October 2020, the Estate sued UDOT, asserting a claim for wrongful death.[4] The Estate alleged that the stretch of the highway where the crash had occurred was unsafe for semi-truck drivers and that UDOT had breached its "duty to design and build, inspect, repair, maintain, warn, provide mechanisms to rectify the defects, and ameliorate the unsafe design and dangers of the highway."

¶19    In September 2022, the Estate served its expert witness disclosures. The Estate disclosed that its engineering expert (Expert) was "a licensed professional engineer and senior consultant at [an engineering firm] with experience, education, and training in the fields of civil engineering, forensic engineering, and transportation safety."

---

4. Several other defendants were also named in the complaint. Those other defendants are not participants in this appeal.

¶20   In April 2023, after deposing Expert, UDOT filed a motion in limine seeking to disqualify Expert on the grounds that he was "not qualified as a roadway design expert" and that his testimony was "unreliable." The Estate opposed the motion. In July 2023, the district court heard oral argument on the motion. The following month, the court granted the motion in limine and excluded Expert.

*UDOT Moves for Summary Judgment*

¶21   In July 2023, while the motion in limine was pending, UDOT moved for summary judgment. In that motion, as relevant here, UDOT argued that the case should be dismissed because UDOT was immune from suit under the Act and, even if it was not immune, the Estate could not establish that UDOT had breached a duty of care in "the design and condition of" the highway.

¶22   Thereafter, the Estate filed an opposition to UDOT's motion for summary judgment.[5] As pertains to governmental immunity, the Estate argued that UDOT was not immune because its failure "to collect and evaluate the crash and traffic data on [the highway], and then to analyze that data using the standards and engineering judgment, which would have led to feasibility studies and ultimately to truck safety projects being added to [the highway]," was "not on a policy making level" but was instead an "operational level" decision.

---

5. Two days before filing this opposition, the Estate filed a motion pursuant to rule 59 of the Utah Rules of Civil Procedure to alter or amend the district court's ruling and order excluding Expert. The court heard argument on both the rule 59 motion and UDOT's motion for summary judgment at the same hearing and then issued a single ruling addressing both motions. The court denied the rule 59 motion, and the Estate has not appealed that portion of the court's ruling.

¶23 Following oral argument, the district court issued a written ruling granting UDOT's motion for summary judgment. The court agreed with UDOT that the Estate's negligence claim was barred by governmental immunity, reasoning that "UDOT's decisions concerning the safety features on [the highway were] discretionary acts shielded from liability under the [Act]." The court further concluded that the Estate's negligence claim failed as a matter of law because the Estate "lack[ed] any evidence that, absent UDOT's alleged negligence, [Abdelgader's] accident would not have occurred."

## ISSUE AND STANDARD OF REVIEW

¶24 The Estate now appeals, challenging the district court's grant of summary judgment to UDOT. The Estate argues that the court erred in determining that UDOT's decisions regarding truck safety features on the highway were discretionary acts shielded from liability under the Act.[6] Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "We review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *R.O.A. Gen. Inc. v. Salt Lake City Corp.*, 2022 UT App 141, ¶ 13, 525 P.3d 100 (quotation simplified).

## ANALYSIS

¶25 The Act immunizes governmental entities from suit in certain situations. The Act first grants general immunity from suit to governmental entities "for any injury that results from the

---

6. The Estate also takes issue with the district court's decision to exclude Expert and with the court's conclusion that the Estate could not state a prima facie negligence claim. But because our conclusion that UDOT was immune from suit under the Act is dispositive, we do not address these additional claims.

exercise of a governmental function." Utah Code § 63G-7-201(1).[7] But this general immunity is waived under the Act in certain circumstances, including where an injury is caused by "a defective, unsafe, or dangerous condition of any highway." *Id.* § 63G-7-301(2)(h)(i). However, the Act also contains exceptions to this express waiver wherein the government retains its immunity. As relevant here, one such exception to the waiver of immunity is the discretionary function exception:

> A governmental entity, its officers, and its employees are immune from suit, and immunity is not waived, for any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or results from . . . the exercise or performance, or the failure to exercise or perform, a discretionary function, whether or not the discretion is abused . . . .

*Id.* § 63G-7-201(4).

¶26 "The discretionary function exception allows the government to retain immunity for high-level policy decisions regulated by the political process." *Kerr v. City of Salt Lake*, 2013 UT 75, ¶ 14, 322 P.3d 669 (quotation simplified). Our supreme court "has distinguished between discretionary and nondiscretionary decisions on the basis of whether the decision in question involves the formulation of policy or the execution of already-formulated policies." *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995). The exception has always been read "narrowly" and "should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function," *Johnson v. Utah Dep't of Transp.*, 2006 UT 15, ¶ 19, 133

---

7. The Act has been amended since the time the Estate commenced this suit. The provisions controlling our decision, however, have remained substantively the same. For the convenience of the reader, we cite the version of the Act currently in effect.

P.3d 402 (quotation simplified), and it should not be "extended to those acts and decisions taking place at the operational level which concern routine, everyday matters, not requiring evaluation of broad policy factors," *Keegan*, 896 P.2d at 623 (quotation simplified). Discretionary function immunity shields governmental acts and decisions that impact many people "in a myriad of unforeseen ways" from legal actions. *Id.* (quotation simplified). The "continual threat" of suit, in those circumstances, "would make public administration all but impossible." *Id.* (quotation simplified).

¶27 To analyze whether a decision is one of policy and ensure narrowly tailored application of immunity, in *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983), our supreme court adopted a four-part test:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?
>
> (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?
>
> (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?
>
> (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* at 51 (quotation simplified). "When all of the questions are clearly answered in the affirmative, then the challenged act,

omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process." *Kerr*, 2013 UT 75, ¶ 18 (quotation simplified).

¶28 Applying the *Little* test to the undisputed facts in this case, the district court answered each part of the test in the affirmative and found that UDOT was entitled to discretionary function immunity for its decisions related to truck safety features on the highway. On appeal, the parties do not dispute that UDOT has met parts one and four of the test. That is, "public safety on the roads is a basic governmental policy," *Johnson*, 2006 UT 15, ¶ 24, and UDOT possesses the requisite authority to make decisions concerning safety features on the roads, *see* Utah Code § 72-1-201(1)(a), (d). However, the Estate argues that the district court erred in answering parts two and three of the *Little* test in the affirmative. We address each of these questions in turn.

### I. Essential to the Realization of the Objective

¶29 The second question of the *Little* test asks whether the "act, omission, or decision [is] essential to the realization or accomplishment of [the] policy, program, or objective" in question. *Little v. Utah State Div. of Family Services*, 667 P.2d 49, 51 (Utah 1983) (quotation simplified). We conclude that this question is answered in the affirmative here.

¶30 Before turning to our analysis, we address the Estate's framing of the "act, omission, or decision" at issue. *Id.* (quotation simplified). In its motion for summary judgment, UDOT argued that it was entitled to discretionary function immunity over decisions related to truck safety features on the highway—both those made during the Project and those made in using HSIP funds after the Project's completion. On appeal, the Estate acknowledges that "the general design, construction and improvements to [the highway] were possibly [d]iscretionary." (Emphasis omitted.) However, the Estate asserts that UDOT's negligence was not the result of its "general decision to change the highway" but was instead due to UDOT's employees "failing to

review truck crashes" that had previously occurred on the relevant portion of the highway, which review, the Estate contends, "would have led to reviews of truck safety needs on [the highway] and the addition of truck safety features."

¶31 Framing the questioned conduct in this manner, the Estate posits that UDOT's failure or negligence occurred at the operational level because collecting crash data and reviewing truck safety is a "routine" activity, *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995) (quotation simplified), that goes into the planning of every highway improvement project and its "'omission' . . . was not essential to the realization or accomplishment of UDOT's safety policy." (Emphasis omitted.) But construing each routine component of a deliberative process that culminates in an overarching discretionary decision as a separately actionable act or omission for which governmental immunity has been waived would undoubtedly result in discretionary function immunity becoming unavailable in a large swath of cases involving ultimately discretionary governmental decisions. Accordingly, our immunity inquiry focuses on the entire process that UDOT undertakes when deciding whether to add safety features to Utah roads. *See Jenson v. Scribner*, 789 P.2d 306, 309 (Wash. Ct. App. 1990) ("In our view, data collection is merely a function of planning and is, thus, a part of the State decision-making process. It is not the implementation of a decision."). Our inquiry does not allow a plaintiff to flyspeck the entire discretionary process for an alleged failure in a purportedly operational component of that broader process. Where the *ultimate* decision is grounded in policy, discretionary function immunity is not defeated merely because a *component* or *potential component* of the decision-making process could have been included or conducted differently.

¶32 Here, UDOT's decisions concerning the inclusion of truck safety features on the highway occurred during two periods of time: at the time the Project was designed and after the Project's completion through the use of HSIP funds. We conclude that UDOT's ultimate decisions regarding whether to include truck safety features on the highway during both periods of time were

essential to the realization of UDOT's policy of safety on public roads.

¶33 As concerns the safety features initially included as part of the Project, the EIS and the ROD served "as a starting point for the design." UDOT was required to stay within the guidelines contained in these documents, and if the design did not comply, the new design had to have "less impacts" on the canyon. Adding additional safety features that were not called for in the Project's design—and that were not required by AASHTO standards or warranted based on any existing crash data—prevented those improvements from being made to the highway. Given this limitation, the decision to not add truck safety features at that time was essential to UDOT's ability to complete the Project and "bring the highway up to current standards," thus improving safety on Utah roads. That some safety features would be left out in favor of environmental concerns is, in retrospect, unfortunate. But the development of the scope of the Project was quintessential discretionary decision making.

¶34 And the decision of whether to add truck safety features to the highway after the Project's completion using HSIP funds was likewise essential to UDOT's policy of public safety on the roads. The stated "purpose of the HSIP is to achieve a significant reduction in traffic fatalities and serious injuries on *all* public roads." (Emphasis added.) Because HSIP funds are limited, it is imperative that UDOT be allowed to identify and prioritize, on a statewide basis, which safety improvements to fund. Enabling UDOT to act in this manner ensures that the projects that would yield the greatest "reduction in traffic facilities and serious injuries" are selected and is therefore essential to UDOT's policy objectives. *See Johnson v. Utah Dep't of Transp.*, 2006 UT 15, ¶ 26 n.10, 133 P.3d 402 (recognizing that "the government may qualify for the discretionary function exception by demonstrating that a particular allocation of funds was based on an analytical project prioritization").

## II. Exercise of Basic Policy Function

¶35 The third question of the *Little* test asks whether the "act, omission, or decision require[s] the exercise of basic policy evaluation, judgment, and expertise." *Little v. Utah State Div. of Family Services*, 667 P.2d 49, 51 (Utah 1983) (quotation simplified). Once again, we conclude that UDOT has satisfied this part of the test.

¶36 "The key to distinguishing policy decisions from operational decisions is evaluating whether the government actually exercises a level of discretion in a manner that implicates policy-making and thrusts the decision into the political process." *Kerr v. City of Salt Lake*, 2013 UT 75, ¶ 21, 322 P.3d 669 (quotation simplified). Policy-based decisions result from "serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern," *Keegan v. State*, 896 P.2d 618, 625 (Utah 1995) (quotation simplified), whereas operational decisions involve "the ministerial implementation of that basic policy," *Johnson v. Utah Dep't of Transp.*, 2006 UT 15, ¶ 31, 133 P.3d 402 (quotation simplified).

¶37 The Estate argues that UDOT's "decision/omission to not gather and analyze truck crash data" on the highway was not a policy decision because there is no evidence that it "was the subject of intense scrutiny and review." This argument misses the mark, however, because the Estate once again fails to place the challenged conduct or omission within the full context in which it took place.

¶38 As already explained, the Project's *ultimate* initial design as a whole, including which specific safety features should be constructed, was the result of "serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern." *Keegan*, 896 P.2d at 625 (quotation simplified). It is undisputed that the Project's design process spanned decades and involved government agencies on the federal, state, and local levels, as well as private stakeholders and advocacy groups. As

noted by Jefferies during his deposition, an "environmental impact statement is the highest level [environmental study] with the most detail, and it's used for the more complicated, larger projects." Following the conclusion of the environmental impact study, the EIS was finalized and was subsequently approved in the ROD, which dictated the scope of the Project's design and identified the particular sections of the highway that were to be improved as well as how they would be improved.[8] Then, it was the job of experts in UDOT's various departments to meet and determine what "the more specific needs of [the Project] would be, taking the [EIS] as the starting point." And as part of this design process, Jefferies was responsible for "making sure that the [P]roject would meet current [AASHTO and UDOT] standards . . . in effect at the time." Because the highway as initially constructed complied with AASHTO standards—a fact which the Estate does not contest—and because the Project's entire design was crafted at the policy-making level, UDOT is entitled to discretionary immunity for decisions regarding which specific analyses it elected to undertake as part of that process. In other words, it is not this court's job, with the benefit of hindsight, to second-guess the manner in which UDOT exercised its discretion. *See Little*, 667 P.2d at 51. The fact that additional or different crash data could

---

8. The Estate contends that it was inappropriate for UDOT and the district court to reference and rely on the EIS as proof that UDOT considered truck safety features during the Project's design because it was not provided to the Estate and is not in evidence. But this argument again conflates the notion that UDOT was required to conduct a specific analysis during the design process in order to qualify for discretionary immunity with the reality that so long as the ultimate "decisions were the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern, the duties imposed upon UDOT in relation to those decisions are truly discretionary functions and are therefore protected by governmental immunity." *Keegan v. State*, 896 P.2d 618, 625 (Utah 1995) (quotation simplified). There is ample record evidence detailing the EIS process and, in general terms, the contents of the EIS.

have been collected does not defeat immunity where the decision to construct the selected safety features was the subject of intense scrutiny and review.

¶39 So too with UDOT's decisions concerning the addition of safety features using HSIP funds after the Project's completion. HSIP funds are limited. The funds are allocated based on region, and UDOT's administration of the funds is overseen by the FHWA. As illustrated by UDOT's infrastructure projects process flow chart that was in the record and also provided to this court by the Estate during the oral arguments in this case, the decision about which safety projects to fund using HSIP funds involves a multi-step process that includes, among other things, the identification of potential projects, the preparation of a cost-benefit analysis, and the prioritization of identified projects. There is no evidence that UDOT rolls over any HSIP funds from year to year. Where each approved project goes through a multi-step, specific analysis to identify the best-suited projects within the region, UDOT cannot be faulted for the manner in which it ranks potential projects and allocates limited funds. While UDOT, of course, has a duty to construct highways that comply with basic safety standards, decisions about which *additional* features to include in its highway designs are inherently discretionary. "Every highway could probably be made safer by further expenditures, but we will not hold UDOT . . . negligent for having to strike a difficult balance between the need for greater safety and the burden of funding improvements." *Keegan*, 896 P.2d at 624 (quotation simplified).

CONCLUSION

¶40 The district court correctly granted summary judgment to UDOT. As long as the highway's design meets basic safety standards, UDOT's decisions regarding inclusion of additional truck safety features on the highway are discretionary decisions entitled to immunity under the Act. We therefore affirm.

———————